Natalie J. Havlina (ISB # 7498)
*Pro Hac Vice* Application Pending
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Deborah A. Sivas (Cal. Bar No. 135446)
Alicia Thesing (Cal. Bar No. 211751)
Robb W. Kapla (Cal. Bar No. 238896)
Siew Kwok (Law Student)
Tori Ballif (Law Student)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 723-0325
Facsimile: (650) 723-4426

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT and WILD EARTH GUARDIANS, )<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>)<br>BUREAU OF LAND MANAGEMENT, )<br>an agency of the United States, )<br>)<br>Defendant. )<br>) | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## NATURE OF ACTION

1.      This action challenges the Bureau of Land Management's ("BLM") grazing decisions for the Bodie Mountain, Mono Sand Flat, Aurora Canyon, and Potato Peak allotments (collectively, the "Bodie Hills Allotments") in the Bishop Field Office of eastern California as inconsistent with the National Environmental Policy Act ("NEPA") and Federal Land Policy and Management Act ("FLPMA").

2.     The Bodie Hills Allotments are home to the Mono Basin sage-grouse (*Centrocercus urophasianus*), a Distinct Population Segment of the greater sage-grouse occupying the southwestern corner of the species' range.  The Mono Basin sage-grouse's geographic isolation and diminished numbers have placed it in even greater danger of extinction than the species as a whole.

3.     Despite the precarious status of the Mono Basin sage-grouse, the BLM's new grazing decisions for the Bodie Hills Allotments do not contain sage-grouse protections required by the governing Resource Management Plan and implementation of the decisions will contribute to the need to list the Mono Basin sage-grouse as a threatened or endangered species.  The challenged grazing decisions consequently violate both BLM's own Special Status Species Policy and FLPMA.

4.     The challenged grazing decisions also violate NEPA because BLM issued the decisions without taking a hard look at their environmental impacts, including the cumulative impacts that West Nile virus and reasonably foreseeable mining activities in the area will have on the Mono Basin sage-grouse.

5.     The BLM has also refused to prepare supplemental NEPA analysis in response to the significant new information contained in the U.S. Fish and Wildlife Service's recent finding that both the greater sage-grouse and the Mono Basin sage-grouse warrant protection under the Endangered Species Act ("ESA").

6.     The Plaintiffs accordingly seek judicial review setting aside the challenged grazing decisions and remanding them to BLM for the issuance of new decisions that comply with the Bishop Field Office's Resource Management Plan ("Bishop RMP"), BLM's Special Status Species Policy, FLPMA, and NEPA.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. §§ 4321 et seq.; FLPMA, 43 U.S.C. §§ 1701 et seq.; the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq..

8.     An actual, justiciable controversy now exists between Plaintiffs and Defendant.  The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 701-06.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the affected public lands and resources are located in this judicial district.

10.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 701.

### PARTIES

11.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a regional, membership, not-for-profit conservation organization, dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West.  WWP has offices throughout the West, including an office in Reseda, California, and more than 1,400 members in California and throughout the West.  WWP, as an organization and on behalf of its members, is concerned with and active in seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West, including California.  WWP is also active in reviewing and commenting upon agency grazing decisions and in publicizing the adverse ecological effects of grazing in this region.

12.     Plaintiff WILDEARTH GUARDIANS is a regional, membership, not-for-profit conservation organization that works to protect the West's rivers, forests, grasslands, deserts, and species from assault by unconstrained growth and polluting industrial practices like logging, ranching, mining, and oil and gas extraction.

13.     Plaintiffs' members and staff work and/or recreate in Bodie Mountain, Mono Sand Flat, Aurora Canyon, and Potato Peak allotments.  Plaintiffs' members and staff derive aesthetic, recreational, scientific, inspirational, educational, and other benefits from this ecosystem on a regular and continuing basis and intend to do so frequently in the immediate future.

14.     For example, WWP member Michael J. Connor has visited the Bodie Hills allotments numerous times since 1982, when he visited the ghost town of Bodie.  Since that time, he has camped on the allotments on several occasions with other WWP members.  His most recent trip to the allotments occurred in October 2010 and he plans to return in spring 2011 once the roads have reopened.

15.     WWP member Katie Fite has also visited the Bodie Hills allotments on several occasions, most recently in October 2010.  She intends to return there in 2011.

16.     During these visits, Dr. Connor and Ms. Fite have used the allotments for recreation, cultural enrichment, aesthetic enjoyment, camping, photography, wilderness experience, wildlife viewing, and scientific purposes.

17.     Defendant's violations of law and failure to manage the public lands within the Bodie Hills Allotments in a manner consistent with the mandates of NEPA and FLPMA adversely and irreparably injure Plaintiffs' aesthetic, commercial, conservational, scientific, recreational, educational, wildlife preservation, and other interests.  These are actual, concrete injuries to Plaintiffs, caused by Defendant's violations of law, for which judicial relief is required to remedy the harm caused to Plaintiffs.

## FACTUAL ALLEGATIONS

### The Mono Basin Population of the Greater Sage-Grouse

18.     Historically, the greater sage-grouse inhabited every corner of the sagebrush steppe, an ecosystem unique to the American West that once covered some 155 million acres in sixteen western states and three Canadian provinces.  Heralded as the symbol of the sagebrush ecosystem, the greater sage-grouse is best known for the courtship or strutting displays male sage-grouse perform during the spring breeding season at historic breeding sites called "leks."

19.     Since the beginning of European settlement, however, the sage-grouse has declined as human activities degrade, fragment, and destroy its sagebrush habitat.  Consequently, the sage-grouse now occupies less than half of its historic range.

20.     The Mono Basin population of the greater sage-grouse occupies the far southwestern extent of the species' range on the border between California and northwest Nevada in the vicinity of the Mono Lake basin.  This population is variously referred to as the Mono Basin area sage-grouse and, more recently, as the Bi-State sage-grouse Distinct Population Segment in agency and other documents. The Mono Basin sage-grouse population is genetically distinct from all other populations of sage-grouse, likely a result of its geographic isolation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

21.     Extirpation of the Mono Basin population would create a significant gap in the range of the greater sage-grouse and prevent repopulation of areas that were once part of the species' range.

22.     The Mono Basin population has been declining since at least 1916, with a decline of 37-42% measured over the past 50 years.  Considering the Mono Basin sage-grouse's unique genetic make-up and its dwindling numbers, the U.S. Fish and Wildlife Service found that this population might warrant listing under the Endangered Species Act as a threatened or endangered Distinct Population Segment ("DPS") on April 29, 2008.  90-Day Finding on a Petition to List the Western Sage-Grouse (*Centrocercus urophasianus phaios*) as Threatened or Endangered, 73 Fed. Reg. 23173, 23175 (April 29, 2008).

23.     The Greater Sage-Grouse Conservation Plan for the Mono Basin Planning Area of Nevada and Eastern California ("Mono Basin Plan") has divided the remaining Mono Basin sage-grouse into "population management units" ("PMU").  This case concerns BLM grazing allotments in the Bodie Hills PMU.

24.     Like the other Mono Basin PMUs, the Bodie Hills PMU contains large areas of historic sage-grouse habitat that are now unoccupied and unsuitable for restoration for sage-grouse.  The Bodie Hills PMU contains 29 known leks, of which only 14 are known to be active.  The northern and eastern slopes of Bodie Mountain and the area around Paramount Mine provide important spring and summer habitat for the Bodie Hills PMU.

25.     As a small, isolated population, the Mono Basin sage-grouse is particularly vulnerable to the numerous threats facing sage-grouse across the West.  Recent habitat fragmentation and population declines have further isolated the Mono Basin sage-grouse so that it is now separated from the nearest neighboring sage-grouse populations by more than 100 kilometers.  The Mono Basin sage-grouse population itself consists of isolated, local populations.

26.     As a small, isolated population, the Mono Basin sage grouse has limited genetic diversity, which hinders its ability to adapt to environmental change.   The population's isolation thus threatens to decrease its fitness and accelerate population declines, ultimately resulting in "a decline to oblivion for small populations" known as an "extinction vortex."

**Factors Contributing to the Decline of Mono Basin Sage-Grouse**

27.     Numerous factors are contributing to the decline of the Mono Basin sage-grouse, most significantly the degradation, destruction, and fragmentation of its sagebrush habitat.  Sagebrush now covers only 25% of the Mono Basin area and over 70% of suitable sage-grouse habitat has been lost.

28.     A variety of human activities contribute to the loss of the sagebrush, including energy development, off-road vehicle use, mineral exploration, conversion to agricultural lands, residential development, and the construction of power lines, roads, canals, and other infrastructure.  However, it is the BLM's perennial decision to permit livestock grazing at whatever cost that has caused the most damage across the greatest extent of Mono Basin sage-grouse range.

29.     Domestic livestock alter sagebrush steppe by preferentially grazing on native grasses and forbs, trampling sagebrush, compacting the soil, and destroying the microbiotic soil crusts that serve to retain moisture, prevent the invasion of nonnative weeds, and limit wildfire.  Years of grazing results in depletion of the native grasses and forbs, soil erosion, loss of the microbiotic soil crusts, and incursion of weeds.

30.     The impacts of prolonged livestock grazing make habitat unsuitable for sage-grouse. Sage-grouse hens visit leks to mate and then move to suitable nesting habitat.  Hens build their nest on the ground and take sole responsibility for incubating the eggs and raising their broods.  Sage-grouse depend on native grasses and forbs for food and cover during the nesting and brood-rearing seasons. The grasses and forbs in the Mono Basin area have been so depleted, and the riparian areas so degraded, that the shortage of nesting and brood-rearing habitat is causing the Mono Basin sage-grouse to experience a "population bottleneck."

31.     Cattle may flush nesting hens and cause them to abandon their nests, and cattle may trample nests, eggs, and nestlings.  Cattle also consume the vegetative cover that is essential to reduce risks of predation on sage-grouse eggs and nestlings.

32.     Livestock also help promote the invasion of alien or exotic plant species, notably cheatgrass and noxious weeds, through these disturbance effects and by acting as "vectors" that carry and distribute weed seeds into native habitats.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

33.     Livestock grazing devastates riparian areas that protect the West's all-too-scarce water sources.  Riparian areas also play an important role during sage-grouse brood-rearing.  Domestic livestock were bred for the cooler and moister climate of northern Europe; they are poorly adapted for the hot, dry summers of the sagebrush steppe.  During hot periods, livestock try to stay cool by congregating around water sources and shady areas.  This causes severe damage to streams, springs, seeps, and wet meadows.

34.     West Nile virus, a disease transmitted by mosquitoes, also threatens Mono Basin sage-grouse.  Scientists have documented reductions in sage-grouse survival caused by West Nile virus since 2003.

35.     Birds infected with West Nile virus can carry it for long distances and migratory birds are widely considered to be responsible for the spread of the disease in the United States.  In fact, birds are the most significant vector for the disease.

36.     Sage-grouse may easily transmit West Nile virus to one another, either directly or through mosquitoes, when they congregate around standing water, both natural and man-made, during the hot days of late summer.  This is also the season when mosquitoes are most prevalent.  Increased temperatures caused by climate change will likely increase the risk of sage-grouse contracting West Nile virus.

37.     Water developments constructed for the benefit of livestock are a particularly effective vector for West Nile virus.  Stock tanks, ponds, and even hoof prints that collect water provide ideal places for mosquitoes to breed.  Sage-grouse gathering near water development are at risk of infection.  The livestock themselves may also serve as intermediate hosts for the virus, infecting mosquitoes that bite them and then go on to bite (and infect) wildlife such as sage-grouse.

38.     Small, isolated populations like the Mono Basin sage-grouse are at a particularly high risk from West Nile virus.  Mortality among infected sage-grouse can be as high as 100%, and outbreaks in small populations are more likely to reduce numbers beyond the point where recovery is possible.

39.     The Mono Basin sage-grouse population has experienced outbreaks of West Nile virus in the past and frequent visits from migrating birds make further introductions of the disease likely.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

Data suggests that West Nile virus may already be at epidemic levels within the Bodie Hills PMU.  West Nile virus thus poses a serious threat to the conservation of the Mono Basin sage grouse.

**The Pygmy Rabbit**

40.     Like the sage-grouse, the pygmy rabbit is a sage-brush obligate that depends on sagebrush for food, shelter, and other essential biological needs.

41.     The pygmy rabbit has suffered substantial population losses across its range due to the loss and degradation of its sagebrush habitat.

42.     Livestock harm pygmy rabbits in a variety of ways, including trampling their burrows, depleting the native bunchgrasses that are a vital component of the pygmy rabbit's summer diet, and damaging sagebrush that provides food and essential cover from predators.

43.     The range and population levels of the pygmy rabbit have contracted significantly in California as a result of the fragmentation, degradation, and destruction of the sagebrush steppe.

44.     California's Department of Fish and Game considers the pygmy rabbit to be a species of special concern and the California Natural Diversity Database rates the pygmy rabbit as, "Vulnerable; at moderate risk of extinction due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors."

**The Bishop Field Office**

45.     For administrative purposes, the BLM has divided the 256 million acres of public land under its care into units it calls "Field Offices."  43 C.F.R. § 1601.0-5.  The Bishop Field Office encompasses 750,000 acres of public land in Mono County and Inyo County, California, running south along the eastern Sierra from Topaz Lake to Owens Lake.

46.     Each field office is divided into grazing allotments, and each allotment into pastures.  BLM has designated 58 grazing allotments in the Bishop Field Office, and it currently permits 26 individuals and entities to graze their livestock on 52 of the allotments.

47.     This case concerns four allotments located in the Bishop Field Office ("BFO"): Bodie Mountain, Mono Sand Flat, Aurora Canyon, and Potato Peak.

48.     BLM's management of the BFO is governed by the Bishop RMP, which was adopted in 1993.  BLM's California State Office amended the Bishop RMP in 2000 when it adopted the Standards for Rangeland Health and Guidelines for Livestock Grazing for Central California.

49.     The Bishop RMP provides "specific guidelines for managing the various resources and activities occurring throughout the resource area," including the directive that the Field Office must "[m]anage candidate species, sensitive species and other species of management concern in a manner to avoid the need for listing as state or federal endangered and threatened species."  Bishop Resource Management Plan Record of Decision at 13 (April 1993).

50.     The "RMP Decisions" section of the Bishop RMP sets forth "area-wide decisions, which present management prescriptions applicable throughout the entire field office."  Bishop RMP at 16. These management prescriptions include:

- "Yearlong protection of endangered, threatened, candidate, and sensitive plant and animal habitats;"
- "Yearlong Protection within 1/3 mile of sage grouse leks;" and
- "Seasonal Protection within 2 miles of active sage-grouse leks from 5/1 to 6/30."

51.     The "RMP Decisions" section of the Bishop RMP also includes management prescriptions for groups of allotments called management areas.  In the Bodie Hills management area, BLM must provide, "Seasonal Protection and no snowmobile use in sage grouse wintering areas from 11/15 to 5/1."  Bishop RMP at 37.  According to the Bishop RMP's glossary, "Seasonal Protection" means "[d]uring the period specified, no discretionary actions which would adversely affect target resources would be allowed.  Existing uses and casual use would be managed to prevent disturbance which would adversely affect the target resources."  Bishop RMP at G-5.

**The Bodie Hills Allotments**

52.     Together, the four Bodie Hills allotments comprise an area of 133,264 acres of federal public land ranging in elevation from 6,400 feet along the eastern boundary of Mono Lake Scenic Area to 10, 236 feet at the summit of Potato Peak.  They are dominated by sagebrush/bitterbrush and mountain shrub vegetation communities.  Because of their shared characteristics, the Bishop RMP grouped the Bodie Hills Allotments into a management area called the Bodie Hills management area.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

53.     The Bodie Hills Allotments provide habitat for a rich diversity of wildlife, including the greater sage-grouse and the pygmy rabbit.  The Bodie Mountain, Potato Peak, and Aurora Canyon allotments contain several sage-grouse leks and extensive nesting habitat.  In summer, large numbers of sage-grouse migrate to habitat near springs, streams, and meadows in the Bodie Mountain, Potato Peak, and Aurora Canyon allotments.  Sage-grouse also use the Mono Sand Flat allotment.

54.     The BFO may contain the only remaining populations of pygmy rabbit in the state of California.  Pygmy rabbits are known to live on the Bodie Mountain, Potato Peak, and Aurora Canyon allotments.  Pygmy rabbit may also occur on the Mono Sand Flat allotment, which contains suitable pygmy rabbit habitat.

55.     The Hilton Family Trust ("Hilton Trust") is the only permittee authorized to graze livestock on the Bodie Mountain and Mono Sand Flat allotments.  The Hilton Trust grazes these allotments in conjunction with its nearby private land and adjacent federal allotments.

56.     Before the BLM issued the permits at issue in this litigation, it permitted the Hilton Trust to graze 505 cows on the Mono Sand Flat allotment from December 1 to May 31 and to consume 2,357 Animal Unit Months ("AUMs") of forage.  BLM permitted the Hilton Trust to graze 1791 cows on the Bodie Mountain allotment from June 1 to October 15 and to consume 5,647 AUMs.

57.     The Hilton Trust has not grazed the Mono Sand Flat allotment since 2002.

58.     Similarly, F.M. Fulstone, Inc. ("Fulstone") is the only permittee authorized to graze livestock on the Aurora Canyon and Potato Peak allotments.  Fulstone grazes these allotments in conjunction with its nearby private land.

59.     Before BLM issued the permits at issue in this litigation, it permitted Fulstone to graze 235 cows on the Potato Peak allotment from June 1 to October 31 and to consume 1,088 AUMs of forage.  Fulstone was permitted to graze 526 cows on the Aurora Canyon allotment from June 15 to September 30 and to consume 1,737 AUMs.

**The Contested Grazing Decisions**

60.     The Hilton Trust and Fulstone's 10-year grazing permits expired in 2008.  Since that time, BLM has enabled grazing to continue on the Bodie Hills Allotments without analyzing the

- 10 -

environmental impacts of grazing by issuing grazing permits under Section 325 of Public Law 108-108, the grazing appropriations rider.

61.     On December 17, 2007, the BFO sent WWP and other interested individuals a Notice of Proposed Action, indicating that it intended to renew the ten-year grazing permits for the four Bodie Hills allotments.

62.     In July 2008, the BFO published a draft Environmental Assessment ("EA") analyzing its proposal to renew the Hilton Trust and Fulstone's 10-year grazing permits.  Under BLM's proposed alternative, grazing would continue on the Bodie Hills Allotments at the same level and during the same season of use as previously authorized, except on the Mono Sand Flat allotment where the stocking rate would be increased to 2370 AUMs.

63.     The major difference between the historic grazing practices that resulted in the allotments' failure to meet the Fundamentals of Rangeland Health and BLM's proposed action would be the inclusion of additional mandatory terms and conditions in the Hilton Trust and Fulstone's permits. These terms and conditions include:

- "[F]orage utilization on key perennial species [must] not exceed 40 percent on the average";
- If "utilization guidelines on the average of the upland key areas across the allotment are exceeded for 2 consecutive years or in any 2 years out of 5 years, BLM will consult with the permittee to address the situation";
- "[W]hen grazing utilization exceeds 70% in any upland key area for more than 2 consecutive years, immediate management action will be taken to remedy the problem in the area of the allotment that key area represents;" and
- Grazing practices should maintain a minimum herbage stubble height of 4-6 inches on the average on all stream-side riparian and wetland areas at the end of the growing season.

64.     WWP submitted comments on the draft EA, pointing out that the EA failed to consider the extent to which livestock grazing contributes to global climate change and the cumulative impacts that would result from climate change combined with the proposed action.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

65.     WWP urged the BLM to consider multiple alternatives.  One alternative would reduce livestock stocking rates but not eliminate grazing.  A second alternative would close Wilderness Study Areas and areas proposed for Wild and Scenic river designation to livestock grazing in order to "reduce impacts to potential wilderness and thus allow a clear, comparative analysis of the impacts of the proposed action on the various [Wilderness Study Areas]."  A third alternative was to modify allotment boundaries in order to permanently exclude livestock from occupied Mono Basin sage-grouse and pygmy rabbit habitat.

66.     On September 30, 2008, BLM issued two proposed decisions for the Bodie Hills Allotments—one renewing the Hilton Trust's permit to graze the Bodie Mountain and Mono Sand Flat allotments and the other renewing Fulstone's permit to graze the Potato Peak and Aurora Canyon allotments.

67.     At the same time, BLM issued a final EA for the renewal of the Hilton Trust and Fulstone permits.  The final EA considered only three alternatives: the no action alternative, under which grazing would continue as before; a no grazing alternative, under which no grazing would be allowed anywhere in the four allotments; and the Proposed Action Alternative, under which BLM would issue its proposed decisions.

68.     WWP timely protested the proposed decisions to the current Field Manager of the BFO.  WWP's protest reiterated the concerns WWP had expressed in its comments on the EA and further noted the contribution of livestock grazing to the spread of West Nile virus.  WWP urged BLM to adopt mitigation measures to limit the use of stock ponds by mosquitoes.

69.     On July 27, 2009, the BFO issued final decisions for the Bodie Hills Allotments.  The final decisions are substantially identical to the proposed decisions and the Proposed Action Alternative analyzed in the 2008 EA.

**Significant New Information**

70.     On November 4, 2009, the U.S. Geological Survey announced the early release of a comprehensive monograph prepared by the nation's leading sage-grouse experts entitled, "Ecology and Conservation of Greater Sage-Grouse: A Landscape Species and Its Habitats" (the "Monograph").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

71.     On March 3, 2010, the U.S. Fish and Wildlife Service ("FWS") announced its determination that the greater sage-grouse is warranted for listing under the Endangered Species Act, but that listing is precluded by higher agency priorities.  12-Month Findings for Petitions to List the Greater Sage-Grouse, 75 Fed. Reg. 13909 (Mar. 23, 2010).  FWS gave the greater sage-grouse a Listing Priority Number of 8, based on the magnitude and immediacy of the threats confronting it.

72.      FWS also confirmed that the geographic isolation and unique genetic characteristics of the Mono Basin sage-grouse qualify it as a Distinct Population Segment ("DPS") that is "discrete and significant to the overall species." 75 Fed. Reg. at 13990.  FWS gave the Mono Basin sage-grouse a Listing Priority Number of 3 based on the magnitude and the immediacy of the threats confronting it.  Under FWS's listing priority system, "[t]he lower the listing priority number, the higher the listing priority." 75 Fed. Reg. at 14008.

73.     FWS also confirmed that livestock grazing in portions of the Bodie Hills PMU are having negative impacts on Mono Basin sage-grouse.  Id. at 13998.

74.     On May 14, 2010, WWP wrote to the BFO and urged it to prepare supplemental NEPA analysis for the Bodie Hills grazing decisions.  WWP explained that both the Monograph and FWS's warranted but precluded finding contained significant new information that should be considered in a supplemental NEPA document.  WWP also reiterated its concerns about the threat of West Nile virus and provided citations to the Monograph.

75.     BLM has refused to undertake supplemental NEPA analysis on the basis of the Monograph and/or the warranted but precluded finding because, according to BLM, "the findings did not present any new information specific to sage-grouse habitats or populations on these allotments that would warrant the requested supplemental analysis."  Letter from Bernadette Lovato, Bishop Field Office Manager, to Michael J. Connor, WWP California Director, at 1 (July 12, 2010).

### FIRST CAUSE OF ACTION:
### VIOLATION OF NEPA

76.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

77.     This First Cause of Action challenges Defendant's violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., and NEPA's implementing regulations in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

approving the Bodie Hills grazing decisions based on the defective and inadequate 2008 EA and Finding of No Significant Impact ("FONSI").  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

78.     NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Such analysis must include consideration of a reasonable range of alternatives to a proposed action.  42 U.S.C. § 4332(2)(C)(iii) (alternatives); see also 40 C.F.R. § 1502.14 (alternatives including the proposed action).  NEPA also requires cumulative analyses of the likely environmental impacts of a proposed action.  See 40 C.F.R. §§ 1508.7; 1508.25(a)(2).

79.     An agency must prepare a supplemental NEPA document when "significant new information becomes available."  40 C.F.R. § 1502.9(c)(1)(ii).

80.     Defendants violated NEPA and its implementing regulations in multiple respects in adopting the Bodie Hills grazing decisions based on the 2008 EA and FONSI, including:

a.     Failing to prepare an EIS examining the ecological implications of implementing the Bodie Hills grazing decisions;

b.     Failing to consider an adequate range of alternative courses of action that meet the stated need and purpose of the action;

c.     Failing to take the requisite "hard look" at all the significant and potential environmental impacts of the proposed action;

d.     Failing to fully consider the cumulative effects of the proposed action in association with past, present, and reasonably foreseeable future actions, including the impacts of climate change and the mining survey currently underway and reasonably foreseeable future mining activities; and

e.     Failing to prepare supplemental NEPA analysis to consider the significant new information about Mono Basin DPS discussed in the Monograph and FWS's warranted but precluded finding.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

81.     Defendant's failure or refusal to undertake lawful and proper environmental review as required by NEPA is arbitrary, capricious, an abuse of discretion, not in accordance with law, and has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their members.

## SECOND CAUSE OF ACTION:
## VIOLATION OF BISHOP RMP AND FLPMA

82.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

83.     This Second Cause of Action challenges Defendant's violation of the Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq., and its implementing regulations, through BLM's unlawful adoption of the grazing decisions in violation of and contrary to the Bishop RMP.  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

84.     FLPMA governs the management of the federal public lands by the BLM.  FLPMA provides that BLM must develop land use plans for the public lands under its control.  43 U.S.C. § 1712. All resource management decisions made by BLM must conform to the approved land use plan.  43 C.F.R. § 1610.5-3(a).

85.     The Bishop RMP governs resource management decisions involving the BFO, including decisions concerning the Bodie Hills Allotments.

86.     The Bodie Hills grazing decisions violate the Bishop RMP in numerous ways, including, but not limited to, the following:

a.     They fail to manage candidate and sensitive species, including the sage-grouse and the pygmy rabbit, in a manner to avoid the need for state or federal listing as a threatened or endangered species;

b.     They fail to provide yearlong protection of candidate and sensitive species, including the sage-grouse and the pygmy rabbit;

c.     They fail to provide yearlong protection within one-third of a mile of sage-grouse leks;

d.     They fail to provide seasonal protection within two miles of active sage-grouse leks from May 1 to June 30; and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

e.    They fail to provide seasonal protection within sage-grouse winter use areas from November 15 to May 1.

87.    Defendant's violations of the Bishop RMP, FLPMA, and FLPMA's implementing regulations are arbitrary, capricious, an abuse of discretion, and not in accordance with law, and will allow serious ecological degradation as well as harm to the public and Plaintiffs' interests, unless reversed by this Court.

<b><u>THIRD CAUSE OF ACTION:</u></b><br><b><u>VIOLATION OF SPECIAL STATUS SPECIES POLICY AND FLPMA</u></b>

88.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

89.    This Third Cause of Action challenges Defendant's violations of FLPMA, 43 U.S.C. § 1701 et seq., BLM's implementing regulations, handbook, manual, and policies.  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

90.    FLPMA imposes procedural and substantive statutory requirements upon Defendant's management of the public lands in question here, including mandates relating to multiple use/sustained yield and preventing unnecessary or undue degradation of the public lands and resources.  Pursuant to these and other statutory authorities, BLM has adopted various regulations, handbooks, manuals, conservation strategies, and other policies relating to its management of the public lands, including the Special Status Species Policy, Section 6840 of the BLM Manual (2001).

91.    The Special Status Species Policy requires that BLM "shall ensure that actions authorized, funded or carried out by the BLM do not contribute to the need for the species to become listed."  See BLM Manual 6841.06C.

92.    Defendant's adoption of the Bodie Hills grazing decisions violate the Special Status Species Policy by authorizing livestock grazing that will further destroy, fragment, and degrade sagebrush habitats in the Bodie Hills area, causing further declines in habitat and populations of the Mono Basin sage-grouse DPS and the pygmy rabbit and contributing significantly to their decline and the need to list them under the ESA.

93.    Defendant's adoption of the Bodie Hills grazing decisions is arbitrary, capricious, an abuse of discretion, and not in accordance with law under FLPMA and the APA, and will allow serious

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br>Case No.

ecological degradation as well as harm to the public and Plaintiffs' interests, unless reversed by this Court.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

A.      Order, adjudge, and declare that the Bodie Hills grazing decisions, EA, and FONSI violate NEPA, FLPMA, the Bishop RMP, and/or the Administrative Procedure Act;

B.      Reverse and remand the Bodie Hills grazing decisions, EA and FONSI;

C.      Enter such temporary, preliminary, or permanent injunctive relief as Plaintiffs may hereafter specifically seek;

D.      Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation and the related administrative proceedings pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 et seq., and/or all other applicable authorities; and/or

E.      Grant such further relief as the Court deems necessary or appropriate to redress the BLM's legal violations and protect the public lands and resources of the Bodie Hills Allotments from further degradation.

Dated this 25th day of October, 2010.

Respectfully submitted,


ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School


By:  _/s/ Deborah A. Sivas_____
              Deborah A. Sivas


ADVOCATES FOR THE WEST

By: _/s/ Natalie J. Havlina_____
              Natalie J. Havlina