Natalie J. Havlina (ISB # 7498)
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Deborah A. Sivas (Cal. Bar No. 135446)
Alicia Thesing (Cal. Bar No. 211751)
Leah Russin (Cal. Bar No. 225336)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 723-0325
Facsimile: (650) 723-4426

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT and WILD EARTH GUARDIANS, | No. 2:10-CV-02896-KJM-KJN |
| Plaintiffs, | |
| vs. | **OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| BUREAU OF LAND MANAGEMENT, an agency of the United States, | |
| Defendant, | **Date:  March 14, 2012** |
| | **Time: 10:00 a.m.** |
| R.N. FULSTONE COMPANY, a Nevada corporation and the FLYING M. RANCH, | **Courtroom:  3** |
| Defendant-Intervenors. | |

1
## <u>TABLE OF CONTENTS</u>
2

3 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

4 BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

5 ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6 I.      LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

7 II.     The Contested Grazing Decisions Violate FLPMA . . . . . . . . . . . . . . . . . . . . . 8

8 A.      FLPMA's Consistency Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9 B.      The Bishop RMP Mandates Protections for Sensitive
10        Species. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
11

12 C.     The Bodie Hills Grazing Decisions Do Not Provide
13        Seasonal or Yearlong Protection for Sage-Grouse or
14        Pygmy Rabbit Habitat. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
15

16 III.   BLM VIOLATED NEPA BY AUTHORIZING
17        LIVESTOCK GRAZING BASED ON THE
18        INADEQUATE BODIE EA AND FONSI. . . . . . . . . . . . . . . . . . . . . . . . . . . 13
19

20 A.     The National Environmental Policy Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
21

22 B.     BLM Failed to Consider a Reduced Grazing
23        Alternative in the Bodie EA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
24

25 C.     BLM Failed to Take a Hard Look at the Impacts of
26        the Grazing Decisions on Sensitive Species. . . . . . . . . . . . . . . . . . . . . . . . . . 17
27

28 IV.    BLM FURTHER VIOLATED NEPA BY REFUSING
29        TO CONDUCT SUPPLEMENTAL NEPA ANALYSIS. . . . . . . . . . . . . . . . . 19
30

31 A.     BLM Failed to Take a Hard Look at the New
32        Information in the Monograph and FWS's
33        "Warranted But Precluded" Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
34

35 B.     FWS's "Warranted But Precluded" Findings and the
36        Monograph Contain Significant New Information . . . . . . . . . . . . . . . . . . . . . . . 21
37

# TABLE OF AUTHORITIES

**STATUTES**

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

43 U.S.C. § 1712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

43 U.S.C. § 1732 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 1500.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

40 C.F.R. § 1502.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

43 C.F.R. §§ 1601.0-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

43 C.F.R. § 1601.0-5 . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

43 C.F.R.§ 1610.5-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**CASES**

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d
1208 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.
402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552
(9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 21

*Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562
(9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*
387 F.3d 989 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Marsh v. Ore. Natural Res. Council*, 490 U.S. 360

(1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800
 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722
(9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*N. Alaska Envtl. Center v. Kempthorne*, 457 F.3d 969
(9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55
(2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d
846 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Or. Natural Desert Ass'n v. BLM*, 531 F.3d 1114
(9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Or. Natural Res. Council Action v. U.S. Forest Serv.,* 445
F. Supp. 2d 1211 (D. Or. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120
(9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pacific Coast Federation of Fishermen's Ass'n v. NMFS,*
265 F.3d 1028 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Sierra Club v. Bosworth*, 05-CV-397-CRB, 2005 WL
2204986 (N.D. Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Sierra Club v. U.S. Forest Serv.,* 843 F.2d 1190
(9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Swanson v. U.S. Forest Serv.,* 87 F.3d 339 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 22

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the
Interior*, 608 F.3d 592, 599 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017
(9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*WWP v. Bennett*, 392 F. Supp. 2d 1217 (D. Idaho 2005) . . . . . . . . . . . . . . . . . . . . . . . . 9

*WWP v. Dyer*, 04-CV-181-BLW, 2009 WL 484438

1

2

3

4

5

6

7

8

9

10

(D. Idaho 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*WWP v. Salazar*, 08-CV-516-BLW, 2011 WL 4526746
(D. Idaho 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 16

*WWP v. U.S. Fish and Wildlife Service*, 535 F. Supp. 2d 1173
(D. Idaho 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1  **INTRODUCTION**

2     This case challenges the Bureau of Land Management's ("BLM") violations of the

3  Federal Lands Policy and Management Act ("FLPMA") and the National Environmental Policy

4  Act ("NEPA") in issuing new grazing decisions for four public lands allotments in the Bodie

5  Hills of eastern California's Mono Basin.

6     The Bodie Hills grazing decisions fail to provide seasonal and yearlong protections for

7  two sensitive species, the sage-grouse and the pygmy rabbit, as required by BLM's Resource

8  Management Plan for the area. The grazing decisions thus violate FLPMA and must be set aside.

9     The Bodie Hills grazing decisions must also be set aside because BLM did not analyze

10  the decisions' environmental impacts as required by NEPA. Specifically, BLM failed to analyze

11  an adequate range of alternatives or take the required "hard look" at the impacts of grazing on

12  sage-grouse and pygmy rabbit. BLM further violated NEPA by not supplementing its analysis in

13  light of significant new information about Mono Basin sage-grouse set forth in the U.S. Fish and

14  Wildlife Service's ("FWS") March 2010 determination that the sage-grouse "warrants"

15  Endangered Species Act protection – a finding that was based on extensive new scientific

16  literature that BLM has never addressed.

17     The Court should accordingly declare that BLM violated FLPMA and NEPA in adopting

18  the Bodie Hills grazing decisions, that BLM violated NEPA in refusing to prepare supplemental

19  NEPA analysis, and set a briefing schedule to determine appropriate remedies.

20  **BACKGROUND**

21  **The Greater Sage-Grouse.**

22     The greater sage-grouse once inhabited every corner of the sagebrush steppe, an

23  ecosystem unique to the American West that covered 155 million acres. Separate Statement of

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --1

1    Undisputed Facts ("SOF") ¶ 1. The sage-grouse's life cycle, range, and persistence is

2    inextricably linked with the sagebrush ecosystem. *See* SOF ¶¶ 2- 7(describing the seasonal

3    habitat needs).

4            Human development, however, has altered, fragmented, and degraded the sagebrush

5    habitat. The sagebrush ecosystem is now considered one of the most imperiled ecosystems on the

6    continent and the sage-grouse occupies little over half of its historic range. SOF ¶ 9.

7            In 2004, the Western Association of Fish and Wildlife Agencies published a "Greater

8    Sage-grouse Conservation Assessment," prepared by the nation's leading sage-grouse scientists.

9    SOF ¶ 8. The Conservation Assessment confirmed that the alteration and loss of the bird's

10   sagebrush habitat has contributed to a long-term decline in the sage-grouse population. *Id.*[1]

11           Reflecting these declines, BLM has designated the greater sage-grouse as a "sensitive"

12   species across its range, including in the Mono Basin, under its "Special Status Species Policy,"

13   which requires BLM to ensure that its management decisions do not contribute to the need for

14   ESA listing of those species.  SOF ¶¶ 11, 34.

15           **Livestock Grazing Damages Sagebrush Habitat.**

16           Livestock were introduced to the western landscape in the 1800s, largely without

17   regulation. Historic grazing practices seriously depleted native grasses and forbs needed by sage-

18   grouse and facilitated invasions by non-native plants, including cheatgrass. SOF ¶ 21.

---

[1] The Conservation Assessment has been widely recognized as reflecting the best available science on sage-grouse at the time of its release. *See WWP v. Salazar,* 08-cv-516-BLW, 2011 WL 4526746, at *13 (D. Idaho Sept. 28, 2011)(discussing Conservation Assessment in holding that BLM violated NEPA and FLPMA by adopting land use plans for two Field Offices without adequately evaluating impacts on sage-grouse); *WWP v. U.S. Fish and Wildlife Service*, 535 F. Supp. 2d 1173, 1185-86 (D. Idaho 2007) (reversing FWS "not warranted" ESA listing determination for sage-grouse as the result of improper political meddling that did not follow the best available science in the Conservation Assessment).

1    Even under current federal regulations, domestic livestock grazing continues to damage

2    the sagebrush ecosystem because – according to the Conservation Assessment and other science

3    – "even reduced numbers of livestock may still exert a larger influence on those habitats." SOF

4    ¶ 22. Specifically, domestic livestock alter the sagebrush steppe by consuming native grasses and

5    forbs, trampling sagebrush, compacting the soil, and destroying the microbiotic soil crusts that

6    retain moisture and limit wildfire. *Id*. The introduction of invasive plants increases the risk and

7    severity of wildfires, which can irreversibly alter the composition of the ecosystem. In addition,

8    livestock damage streams, springs, seeps and wet meadows when cattle congregate around these

9    riparian areas in summer. SOF ¶ 23.[2]

10    Livestock grazing also harms the pygmy rabbit, another sagebrush obligate that depends

11    on sagebrush for food, shelter, and other essential needs. The pygmy rabbit is the smallest rabbit

12    in North America, weighing between 0.54 and 1.2 pounds as an adult. SOF ¶ 29. Livestock harm

13    pygmy rabbits by trampling their burrows, depleting the native bunchgrasses they eat, and

14    damaging sagebrush that provides food and cover from predators. SOF ¶ 31. BLM has

15    designated the pygmy rabbit as a sensitive species, and the California Department of Fish and

16    Game considers it a species of special concern. SOF ¶ 30.

17    **The Bodie Hills Allotments.**

18    Located in the Mono Basin region of California and Nevada, the Bodie Hills allotments

19    stand at the western edge of greater sage-grouse's range; and are home to what is now termed the

20    "Bi-State" population of sage-grouse. The Bi-State population is geographically isolated and

21    genetically distinct from other populations of sage-grouse. SOF ¶¶ 13-15.

---

[2] Chief Judge Winmill of the District of Idaho catalogued these adverse impacts of grazing on sage-grouse habitat in lengthy findings of fact rendered after a 2-week injunction hearing over the BLM's management of grazing in sagebrush-steppe in southern Idaho. *See WWP v. Dyer*, 04-CV-181-BLW, 2009 WL 484438 (D. Idaho 2009), Findings of Fact ¶¶ 1-54, 86-133, 245-47.

1    The Bodie Hills allotments are managed by BLM's Bishop Field Office. The specific

2    grazing decisions at issue here concern the Bodie Mountain, Mono Sand Flat, Aurora Canyon,

3    and Potato Peak allotments (collectively, "the Bodie Hills allotments"). SOF ¶ 39.

4    The Bodie Hills allotments are dominated by sagebrush, bitterbrush and other mountain

5    shrubs, providing habitat for a rich diversity of wildlife. SOF ¶ 44. The Bodie Mountain, Aurora

6    Canyon, and Potato Peak allotments contain several sage-grouse leks, extensive nesting habitat,

7    and late summer habitat near springs, streams, and meadows. Pygmy rabbits are known to live on

8    these three allotments. The Mono Sand Flat allotment is also home to sage-grouse and contains

9    suitable pygmy rabbit habitat. SOF ¶¶ 45-46.

10    **Renewal of Grazing Permits for the Bodie Hills Allotments.**

11    BLM has historically permitted R.N. Fulstone ("Fulstone") to graze livestock on the

12    Aurora Canyon and Potato Peak allotments and the Hilton Family Trust dba Flying M Ranch

13    ("Flying M") to graze on the Bodie Mountain and Mono Sand Flat allotments. SOF ¶¶ 49-50.

14    Fulstone and Flying M's term grazing permits for the Bodie Hills allotments expired in

15    2008. BLM proposed to renew the permits and published a draft Environmental Assessment

16    ("Draft EA") analyzing its proposal. SOF ¶¶ 51-53. The Draft EA examined three alternatives:

17    (1) reauthorize grazing on the four allotments with some new "applicable terms and conditions

18    and other provisions" incorporated into the permits ("Proposed Alternative"), (2) renew the

19    permits "with the same terms and conditions as under the existing authorizations" ("No Action

20    Alternative"), and (3) cancel the grazing permits ("No Grazing Alternative"). BLM's Proposed

21    Alternative would continue livestock grazing at the same level and during the same seasons of

22    use as the prior permits. *Compare* SOF ¶¶ 49-50 (describing prior permits) *with* SOF ¶¶ 54, 65-

23    66 (describing Proposed Alternative).

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --4

1    Plaintiff Western Watersheds Project ("WWP") submitted comments on the draft EA

2  pointing out deficiencies in BLM's NEPA analysis, including the EA's failure to analyze the

3  impacts of livestock grazing on the sage-grouse and pygmy rabbit as required by BLM's Special

4  Status Species policy. WWP's comments also urged BLM to consider additional alternatives,

5  including an alternative that would allow livestock grazing to continue at a reduced stocking rate.

6  SOF ¶¶ 55-56.

7    On September 30, 2008, BLM issued a final EA (the "Bodie EA"), a Finding of No

8  Significant Impacts ("FONSI"), and its proposed decisions to renew the grazing permits for the

9  Bodie Hills allotments. SOF ¶¶ 57, 61-62. The Bodie EA rejected WWP's proposed reduced

10 grazing alternative without detailed analysis. SOF ¶¶ 59-60. In the FONSI, BLM determined that

11 it did not need to prepare an Environmental Impact Statement regarding the impacts of

12 continuing livestock grazing on the Bodie Hills allotments. SOF ¶ 61.

13    WWP timely protested the proposed decisions to the Bishop Field Office manager and

14 reiterated its concern that the EA did not consider an adequate range of alternatives. WWP also

15 urged BLM to analyze the extent to which the allotments' range developments act as a vector for

16 West Nile Virus ("WNv") and asked BLM to revise the grazing decisions to "incorporate

17 appropriate vector control mitigations." SOF ¶¶ 63-64. On July 27, 2009, the BLM again

18 rejected WWP's concerns and suggestions, and issued final decisions for the Bodie Hills

19 allotments that are substantively identical to the proposed decisions. SOF ¶¶ 65-66.

20    **The Sage-Grouse Monograph and FWS's "Warranted But Precluded" Findings.**

21    On November 4, 2009, the United States Geological Survey announced the early release

22 of a new comprehensive monograph about sage-grouse, based on substantial new data and

23 science prepared by leading federal and state researchers, entitled "Greater Sage-Grouse:

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --5

1  Ecology and Conservation of a Landscape Species and Its Habitats" (S. Knick *et. al.*, eds) (the

2  "Monograph"). SOF ¶ 69.

3      The Monograph revealed that the Bi-State population faces a high risk of extinction. SOF

4  ¶ 70. For instance, the Bi-State population is particularly vulnerable to WNv due to its small size,

5  isolated location, and low genetic diversity. Stock tanks, ponds, and water-filled hoof prints

6  increase this risk by providing breeding habitat for mosquitoes, which are the primary vector for

7  the transmission of WNv. The authors recommended, "[e]liminating mosquito breeding habitat

8  from anthropogenic water sources is crucial for reducing impacts." SOF ¶ 71.

9      Relying heavily on the Monograph, FWS published its determination in March 2010 that

10  the greater sage-grouse "warrants" listing under the Endangered Species Act ("ESA"), although

11  FWS concluded that proceeding with a listing rule was "precluded by higher priority listing

12  actions at [that] time." *See* Twelve Month Findings on Petitions To List Greater Sage-grouse As

13  Threatened Or Endangered," 75 Fed. Reg. 13910 (March 20, 2010).  FWS gave the greater sage-

14  grouse a listing priority number of 8 out of 12 based on the magnitude and immediacy of the

15  threats it faces, including "the present or threatened destruction, modification, or curtailment of

16  its habitat." SOF ¶ 73 (describing FWS's listing priority system).

17      FWS recognized that the Bi-State population is a "distinct population segment" ("DPS")

18  of sage-grouse at even greater risk of extinction than the species as a whole. SOF ¶ 74. Threats to

19  the greater sage-grouse may have an "exacerbated and magnified" effect on the Bi-State DPS

20  "due to the small number and size and isolation of [its] local populations." SOF ¶ 77.  FWS thus

21  assigned the Bi-State DPS a listing priority number of 3 based on the "high magnitude" and

22  imminence of the threats facing the DPS. SOF ¶ 76.

1    FWS determined that the Bodie Population Management Unit ("PMU"), which includes

2    the allotments at issue in this case, holds the largest stronghold of leks in the California and

3    Nevada Bi-State area, accounting for 29 out of 89 total leks. SOF ¶ 80. However, FWS also

4    noted that adult survival rates in the Bodie Hills are below the level of sustainability and

5    livestock grazing "has a negative effect" on sage-grouse in the area. SOF ¶¶ 80-81.

6    FWS also confirmed that "[s]ubstantial new information on WNv and impacts on the

7    greater sage-grouse has emerged since we completed our finding in 2005 . . ." FWS found that

8    more severe outbreaks of WNv will be more likely in the future under the best available climate

9    change projections, and confirmed that WNv poses a high risk of extirpation to the Bi-State

10    population. SOF ¶¶ 78-79.

11    **BLM's Refusal to Conduct Supplemental NEPA Analysis.**

12    On May 14, 2010, WWP petitioned BLM to conduct supplemental NEPA analysis for the

13    Bodie Hills grazing decisions based on the significant new information in the Monograph and

14    FWS's March 2010 "warranted but precluded" finding. SOF ¶ 82. WWP specifically brought

15    BLM's attention to the chapter that contains the new information about WNv. SOF ¶ 83.

16    BLM denied WWP's petition on June 30, 2010, stating, "the findings did not present any

17    new information specific to sage-grouse habitats or populations on these allotments that would

18    warrant the requested supplemental analysis." BLM's letter did not mention the Monograph.

19    SOF ¶ 84. WWP and WildEarth Guardians filed this suit on October 26, 2010.

20    <u>**ARGUMENT**</u>

21    **I.    LEGAL STANDARDS.**

22

23    The Administrative Procedure Act provides the legal standard under which the Court

24    must evaluate BLM's compliance with FLPMA and NEPA. Under the APA, courts must "hold

1    unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious,

2    an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

3        An action is arbitrary and capricious when the agency "relied on factors which Congress

4    has not intended it to consider, entirely failed to consider an important aspect of the problem,

5    offered an explanation for its decision that runs counter to the evidence before the agency, or is

6    so implausible that it could not be ascribed to a difference in view or the product of agency

7    expertise." *Pacific Coast Federation of Fishermen's Ass'n v. NMFS*, 265 F.3d 1028, 1034 (9th

8    Cir. 2001). Although the standard of review is narrow, the court's review of the facts must

9    nonetheless be careful and searching. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

10   402, 416 (1971).

11   **II.    THE CONTESTED GRAZING DECISIONS VIOLATE FLPMA.**
12

13       The Bodie Hills grazing decisions fail to provide the seasonal and yearlong protections

14   mandated by the Bishop Resource Management Plan; and must accordingly be set aside as

15   violating FLPMA's land use plan "consistency" requirement.

16   **A.    FLPMA's Consistency Requirement.**

17       FLPMA established the Congressional policy that "the public lands be managed in a

18   manner that will protect the quality of the scientific, scenic, historical, ecological, environmental,

19   air and atmospheric, water resource and archeological values." 43 U.S.C §1701(a)(8). FLMPA

20   directs the Secretary of the Interior to manage the public lands "for multiple use and sustained

21   yield." 43 U.S.C. § 1732(a).

22       In order to carry out this duty, BLM must "develop, maintain, and, when appropriate,

23   revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C.

24   §1712(a).  A BLM land use plan that governs the management of a field office is called a

1   Resource Management Plan ("RMP"). 43 C.F.R. §§ 1601.0-3, 1601.0-5(k). FLPMA's

2   consistency requirement directs that BLM must manage the public lands "in accordance with"

3   the applicable RMP. *See* 43 U.S.C. § 1732(a). *See also* 43 C.F.R. § 1610.5-3(a)(BLM's

4   management of the public lands must be "clearly consistent with the terms, conditions, and

5   decisions of the approved plan.")

6        An agency action that does not comply with the requirements of the governing RMP

7   violates FLPMA and must be set aside. As the Supreme Court has explained,

8        The statutory directive that BLM manage "in accordance with" land use plans, and the
9        regulatory requirement that authorizations and actions "conform to" those plans, prevent
10       BLM from taking actions inconsistent with the provisions of a land use plan.  Unless and
11       until the plan is amended, such actions can be set aside as contrary to law pursuant to 5
12       U.S.C. § 706(2).
13
14   *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004). *See also Oregon Natural*

15   *Res. Council Fund v. Brong*, 492 F.3d 1120, 1128 (9th Cir. 2007)(setting aside BLM logging

16   project as inconsistent with governing land use plan).

17        In *WWP v. Bennett*, 392 F. Supp. 2d 1217, 1223 (D. Idaho 2005), WWP challenged

18   BLM's decision to approve livestock grazing permits on 28 allotments in Idaho.  The governing

19   RMP mandated, "wildlife goals and watershed needs will be satisfied prior to allowing increases

20   in livestock use," but BLM did not conduct any monitoring to determine the status of sensitive

21   species in most of the allotments.  The court held that BLM's failure to ensure that wildlife needs

22   were met before increasing livestock grazing violated FLPMA's consistency requirement, and

23   reversed the challenged decisions while also imposing injunctive relief. *Id.*

24        **B.      The Bishop RMP Mandates Protections for Sensitive Species**.

25        BLM's management of the Bodie Hills allotments is governed by the Bishop RMP.  SOF

26   ¶ 40. The Bishop RMP emphasizes environmental values and focuses on presenting

1    "management prescriptions to . . . enhanc[e] or maintain important wildlife habitats or

2    populations." *Id.* at 8881, 8884.

3         Consistent with these goals, the Bishop RMP requires livestock grazing systems to be

4    structured around the needs of wildlife, including sage-grouse. *See* Bishop RMP at 8891

5    ("Grazing system design will include consideration of wildlife habitat, watershed and desired

6    plant community goals."); *id.* at 8891-92 (prohibiting the placement of livestock handling

7    facilities, fences, salt, or supplemental feeding devices on sage-grouse leks). Likewise, BLM

8    must change grazing management, "[i]f monitoring shows that resource condition objectives

9    established in the RMP are not being met." *Id.* at 8935.

10         The "resource condition objectives" are set forth in the section of the Bishop RMP called

11   "RMP Decisions." *Id.* at 8896. The Area Wide RMP Decisions, "present management

12   prescriptions valid throughout the entire Bishop Resource Area." *Id.* These include the Decision

13   to "Protect and enhance unique and important vegetation communities and wildlife habitats," by

14   providing, 1) Yearlong protection of endangered, threatened, candidate, and sensitive plant and

15   animal habitats; 2) Yearlong Protection within 1/3 mile of sage grouse leks; and 3) Seasonal

16   Protection within two miles of active sage-grouse leks from May 1 to June 30. SOF ¶ 43.

17         In areas provided with seasonal or yearlong protection, "No discretionary actions which

18   would adversely affect target resources would be allowed. Existing uses and casual use would be

19   managed to prevent disturbance which would adversely affect the target resources." Bishop RMP

20   at 8985, 8987. Assuming livestock grazing to be an "existing use," BLM must manage it to

21   prevent disturbance of sage-grouse leks year round and within two miles of active leks in May

22   and June. More generally, BLM must ensure that livestock grazing does not impact habitat to an

23   extent that adversely affects sage-grouse or pygmy rabbit.

1
2
**C.      The Bodie Hills Grazing Decisions Do Not Provide Seasonal or Yearlong Protection for Sage-Grouse or Pygmy Rabbit Habitat.**

3
4       Neither of the Bodie Hills grazing decisions at issue in this litigation provide seasonal

5   and yearlong protection of sensitive species habitat, as required by the Bishop RMP, and hence

6   must be set aside under the APA and FLPMA's consistency requirement.

7       Rather than protecting habitat within two miles of active leks from May 1 to June 1, the

8   Bodie Hills grazing decisions authorize livestock grazing that will disturb and adversely affect

9   sage-grouse during the nesting season. The Bodie Hills grazing decisions authorize grazing from

10  June 1 to June 30 on the Bodie Mountain, Potato Peak, and Aurora Canyon allotments. SOF ¶¶

11  65-66.  These three allotments contain several leks and extensive nesting habitat, part of the

12  highest concentration of leks and nesting habitat in the Bi-State area. SOF ¶¶ 45, 80.

13      Allowing livestock to graze on these allotments from June 1 to June 30 will adversely

14  affect sage-grouse by disturbing nesting mothers and increasing the abandonment of nests.

15  Grazing also increases the potential for predation of hens and chicks by reducing cover, and

16  trailing livestock trample sage-grouse nests. SOF ¶ 25. *See also Dyer,* 2009 WL 484438, at * 21

17  (finding that summer grazing "should be limited around leks and nests . . . so that grazing is not

18  occurring during the mating and nesting seasons").  BLM has thus violated the Bishop RMP's

19  requirement that BLM provide seasonal protection within 2 miles of active leks.

20      The Bodie Hills grazing decisions are also inconsistent with the Bishop RMP's

21  requirement that BLM provide yearlong protection for the areas within 1/3 mile of active leks.

22  Leks are located on open areas adjacent to nesting habitat and surrounded by tall sagebrush used

23  for escape and feeding cover. SOF ¶ 3.

24      Rather than limiting disturbance on leks, the Bode Hills grazing decisions promote more

25  intense grazing on the uplands, including on and near leks. The Bodie Hills grazing decisions are

1    designed to increase the distribution of livestock across the uplands. SOF ¶ 68. Increasing

2    distribution of livestock brings the impacts associated with livestock grazing—including the loss

3    of native grasses, forbs, and sagebrush used for escape and hiding cover during the breeding

4    season—to upland areas that were previously undisturbed. SOF ¶ 22.

5        Nor do the Bodie Hills grazing decisions contain terms and conditions or monitoring

6    requirements to limit disturbance on leks and nearby areas. The decisions indicate that livestock

7    may not consume more than 40 percent of perennial species on the uplands "on the average," but

8    this standard only applies in "key areas." SOF ¶ 67. The decisions do not define key areas, or

9    indicate how many of the allotments' leks are located in key areas. Even in key areas, BLM will

10   only respond to noncompliance if livestock consume more than 70 percent of the vegetation for

11   two years in a row. *Id.* Consequently, the Bodie Hills grazing decisions will increase the

12   disturbance of areas within 1/3 mile of leks in direct contradiction of Bishop RMP's requirement.

13       Additionally, the Bodie Hills grazing decisions are inconsistent with the Bishop RMP

14   because they fail to provide yearlong protection of pygmy rabbit habitat. The grazing decisions

15   do not contain any provisions designed to limit disturbance of pygmy rabbit habitat. This is not

16   surprising, since the Bodie EA failed to acknowledge many of the ways that grazing affects

17   pygmy rabbits. *See* Section III.C below. Nor do the Bodie Hills grazing decisions provide for any

18   monitoring of pygmy rabbit populations or habitat known to be occupied by pygmy rabbits to

19   ensure that this species is not being adversely affected by grazing. *See* A.R. 32, 769-771 & A.R.

20   33, 797-798 (terms and conditions in grazing decisions for the four allotments); A.R. 61, 1508 &

21   A.R. 62, 1515-16 (cooperative monitoring plans for the four allotments).

22       Finally, the record confirms that BLM did not make any attempt to provide the seasonal

23   and yearlong protections for sensitive species habitat required by the Bishop RMP. Remarkably,

1  the Bodie EA makes *no mention* of the Bishop RMP's seasonal and yearlong protection

2  requirements for sensitive species. Nor does the record contain any other documentation that

3  BLM considered these requirements or attempted to implement them in the grazing decisions.

4       The Bodie Hills grazing decisions are thus inconsistent with the Bishop RMP and violate

5  FLPMA. They must accordingly be set aside as arbitrary, capricious, and contrary to law.

6  **III.    BLM VIOLATED NEPA BY AUTHORIZING LIVESTOCK GRAZING BASED**
7  **ON THE INADEQUATE BODIE EA AND FONSI.**
8
9       BLM's EA and FONSI – which determined that renewing the Bodie Hills allotments'

10  grazing permits would not significantly affect the environment – also must be reversed under the

11  APA and NEPA, because BLM failed to consider an adequate range of alternatives or take a hard

12  look at the impacts of grazing on sensitive species.

13       **A.    The National Environmental Policy Act**.

14       NEPA "is a procedural statute that requires the Federal agencies to assess the

15  environmental consequences of their actions before those actions are undertaken." *Klamath-*

16  *Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt*., 387 F.3d 989, 993 (9th Cir. 2004). A federal

17  agency such as BLM must prepare an Environmental Impact Statement ("EIS") for every "major

18  federal action significantly affecting the quality of the human environment." 42 U.S.C. §

19  4332(C).

20       If an agency is uncertain whether the action will have significant impacts, the agency

21  may prepare an Environmental Assessment ("EA") – "a 'concise public document' designed to

22  '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an

23  environmental impact statement . . . '" *Klamath-Siskiyou*, 387 F.3d at 993 (quoting 40 C.F.R. §

24  1508.9).  If, based on its EA analysis, the agency determines that the action will have no

25  significant impacts on the environment, it may issue a FONSI.

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --13

1    An agency cannot avoid preparing an EIS by finding no significant impacts without

2    fulfilling several procedural requirements that show that the agency has taken "the requisite hard

3    look at the environmental consequences of its proposed action." *Te-Moak Tribe of W. Shoshone*

4    *of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 599 (9th Cir. 2010). In its EA, the agency

5    must fully consider all reasonable alternatives to the proposed action and evaluate the action's

6    environmental impacts. *Id.* at 601-03; *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d

7    800, 809-10, 812-14 (9th Cir. 1999).

8    **B.    BLM Failed to Consider a Reduced Grazing Alternative in the Bodie EA.**

9

10    BLM violated NEPA, first, because the Bodie EA failed to analyze any alternative that

11    would allow grazing to continue at reduced stocking rates, so as to protect sage-grouse, pygmy

12    rabbit, and other sensitive resources.

13    The purpose of analyzing alternatives to a proposed action is to "identify and assess the

14    reasonable alternatives to the proposed action that will avoid or minimize adverse effects of these

15    actions upon the human environment." 40 C.F.R. § 1500.2(e). Consequently, an agency's failure

16    to consider an alternative that would reduce the environmental impacts associated with a

17    particular resource use is grounds for remanding the agency's decision. *See Or. Natural Desert*

18    *Ass'n v. BLM*, 531 F.3d 1114, 1145 (9th Cir. 2008)("ONDA") (BLM violated NEPA's

19    alternatives requirement because it "considered no alternative that proposed closing more than a

20    fraction of the planning area to ORV use"); *WWP v. Salazar*, 08-CV-516-BLW, 2011 WL

21    4526746, at *13 (holding that BLM's failure to discuss "alternatives that reduced grazing short

22    of a total ban" violated NEPA).

23    Here, the Bodie EA acknowledges that livestock grazing can and does have adverse

24    effects on the public lands. *See* Bodie EA at 1325 (acknowledging that livestock grazing can

1    affect the quality of sage-grouse habitat); *id.* at 1328-29 (describing how the complete cessation

2    of grazing would benefit the environment). Reducing grazing, without eliminating it entirely, is

3    an alternative designed to reduce these impacts and BLM had an obligation to consider it.

4        BLM's reasons for rejecting WWP's proposed reduced grazing alternative were

5    unreasonable and accordingly violated NEPA. Where an agency identifies an alternative but

6    drops it from further analysis, the agency must offer a sufficient and reasonable explanation for

7    doing so. 40 C.F.R. § 1502.14(a); *N. Alaska Envtl. Center v. Kempthorne*, 457 F.3d 969, 978-79

8    (9th Cir. 2006).

9        BLM rejected WWP's proposal for a reduced grazing alternative because, it stated,

10   rangeland health standards were being met on the four Bodie Hills allotments.  This assertion

11   does not provide a reasonable explanation for rejecting a reduced grazing alternative, because the

12   rangeland health assessments that BLM refers to in fact documented that the riparian standard

13   was *not* being met on three of the Bodie Hills allotments. SOF ¶ 47. The Bodie EA reaffirmed

14   this finding, explaining: "Livestock grazing remains a factor influencing many stream reaches

15   falling short of Proper Functioning Condition and Rangeland Health Standards. Impacts such as

16   lack of post-grazing residual plant biomass, bank sloughing and chiseling, and soil compaction

17   continue to occur and slow the rate of improvement." Bodie EA at 1309.  The record thus refutes

18   BLM's first stated rationale for refusing to consider any reduced grazing alternatives.

19       The second reason BLM gave for refusing to consider a reduced grazing alternative was

20   its claim that reducing stocking rates would violate the Bishop RMP. SOF ¶ 60. Contrary to this

21   claim, the Bishop RMP, "does not address stocking levels, seasons of use, or other details of

22   livestock management," Bishop RMP at 8935, and provides for changes to prior grazing

23   decisions to be made in subsequent decisions and in response to changing conditions. *See id.* at

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --15

1    8934 (contemplating "adjustments in livestock grazing use when monitoring shows a change is

2    warranted"); *id.* at 8937 (explaining, "a deferred [or rest] rotation grazing system will be

3    activated" to meet the management goals [including the improvement of sensitive species

4    habitat] of the Aurora Canyon, Potato Peak, and Bodie Mountain allotments).

5         Third, BLM indicated that it did not need to consider a reduced grazing alternative

6    because WWP "provided no supporting data or information to warrant such an alternative." SOF

7    ¶ 60. It is not the public's burden, however, to supply detailed information in support of an

8    alternative. Rather, as the Ninth Circuit has explained, "Compliance with NEPA is a primary

9    duty of every federal agency; fulfillment of this vital responsibility should not depend on the

10   vigilance and limited resources of environmental plaintiffs." *Friends of the Clearwater v.*

11   *Dombeck*, 222 F.3d 552, 559 (9th Cir. 2000).

12        BLM's refusal to consider a reduced grazing alternative also violates BLM's own Special

13   Status Species Policy. Under this Policy, BLM "should consider all site-specific methods and

14   procedures which are needed to bring the species and their habitats to the condition under which

15   the provisions of the ESA are not necessary, current listings under special status species

16   categories are no longer necessary, and future listings under special status species categories

17   would not be necessary." SOF ¶ 36. Accordingly, BLM should have considered all methods to

18   reduce the impacts of grazing on sensitive species, including reducing livestock grazing.

19        BLM's failure to discuss its deviation from the Special Status Species Policy is a further

20   violation of NEPA. *See WWP v. Salazar*, 2011 WL 4526746, at *13 ("NEPA requires the BLM

21   to discuss its own official policies that on their face apply directly to the review at issue.") *See*

22   *also ONDA*, 625 F.3d at 1115–16 (holding that court could examine agency official policies in

23   determining adequacy of EIS).

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --16

1    Thus, BLM's refusal to consider reducing the stocking rates for the Bodie Hills

2    allotments violated NEPA and the APA, and the grazing decisions must accordingly be reversed.

3    **C.    BLM Failed to Take a Hard Look at the Impacts of the Grazing**
4    **Decisions on Sensitive Species.**
5

6    The Bodie EA and FONSI are also legally inadequate because BLM failed to take a hard

7    look at the impacts of the Bodie Hills grazing decisions on the sage-grouse and the pygmy rabbit.

8    In order to take a hard look at the impacts of an action, BLM must study and explain all

9    present and future effects of the action. "[G]eneral statements about 'possible' effects and 'some

10    risk' do not constitute a 'hard look' absent a justification regarding why more definitive

11    information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d

12    1208, 1213 (9th Cir. 1998).

13    The Bodie EA failed to take a hard look at the impacts of livestock grazing on sage-

14    grouse. The Bi-State Plan documented that additional habitat assessments were needed to

15    determine how grazing affects breeding habitat in the Bodie PMU. SOF ¶ 19. The Bodie EA

16    does not indicate whether the necessary studies were ever conducted. Instead, it makes general

17    statements about the possible effects of grazing, then dismisses these risks based on the

18    assumption that the Bi-State Plan did not consider grazing a "high priority risk to sage-grouse."

19    Bodie EA at 1325. The Bodie EA also failed to consider the probability or impacts of another

20    outbreak of WNv in the Bodie Hills, even though BLM knew there had been an outbreak of

21    WNv in Mono County in 2004 and that sage-grouse rarely survive WNv. SOF ¶¶ 26, 28.

22    The Bodie EA also failed to consider how increasing distribution of livestock will affect

23    sage-grouse habitat. BLM assumed enforcement of the terms and conditions in the new grazing

24    decisions (4-6'' stubble height in riparian areas and 40% utilization limit on upland "key areas")

25    would increase livestock distribution across the uplands, reducing impacts to riparian habitat and

1    leaving enough vegetation behind to provide for sage-grouse. Bodie EA at 1306, 1326-27. The

2    EA does not explain, however, whether a forty percent utilization rate will ensure cover and

3    canopy composition meet the sage-grouse's needs throughout the year. *See* A.R. 190, 5921

4    (summarizing sage-grouse seasonal habitat needs). Nor does the EA consider how spreading

5    livestock into previously undisturbed parts of the uplands will affect habitat conditions. *See* SOF

6    ¶ 68; A.R. 53, 1379 (distribution of livestock into previously ungrazed areas impacts vegetation).

7            In addition, the Bodie EA failed to analyze the majority of the impacts livestock grazing

8    has on pygmy rabbits. *See* Bodie EA at 1327 (limiting discussion of grazing impacts to potential

9    burrow trampling); SOF ¶ 31 (scientific evidence shows "grazing disturbs pygmy rabbits,

10   increases their vulnerability to predation, and increases stress during winter or harsh weather

11   periods."); A.R. 53, 1379-80 (discussing impacts of livestock grazing).

12           Furthermore, the Bodie EA failed to consider how the grazing decisions would affect the

13   need to list the sage-grouse or the pygmy rabbit under the ESA. *See* Bodie EA at 1326-27

14   (discussing impacts of proposed action on sage-grouse and pygmy rabbit). The Bodie EA did not

15   acknowledge that either species had been petitioned for listing under the ESA, or discuss the

16   importance of the Bodie Hills populations to the species rangewide. The EA did not discuss the

17   importance of the Bi-State population's unique genetic material to the sage-grouse species as a

18   whole. Nor did the Bodie EA discuss the status of the area's pygmy rabbit population, even

19   though "the Bishop Field Office may include the only pygmy rabbit populations remaining in

20   California." A.R. 53, 1379.

21           The Bodie EA's failure to discuss how the new grazing decisions would affect the need

22   to list the sage-grouse and pygmy rabbit also violates BLM's Special Status Species Policy,

23   whose objectives include ensuring that actions authorized by BLM "do not contribute to the need

1  to list any special status species." SOF ¶ 34. The Bodie EA does not discuss whether the

2  proposed action is consistent with the Special Status Species Policy, in contrast to its treatment

3  of other policies. *See* Bodie EA at 1253 (discussing compliance with BLM's Interim

4  Management Policy Handbook for Wilderness Study Areas).

5      BLM thus violated NEPA by failing to take a hard look at the impacts of livestock

6  grazing in the Bodie EA.

7  **IV.    BLM FURTHER VIOLATED NEPA BY REFUSING TO CONDUCT**
8  **        SUPPLEMENTAL NEPA ANALYSIS.**
9

10     Finally, the Bodie Hills grazing decisions should be set aside because BLM's refusal to

11  conduct supplemental NEPA analysis was arbitrary and capricious.

12     An agency has a continuing obligation to comply with NEPA and update its

13  environmental analysis if any "significant new circumstances or information relevant to

14  environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. §

15  1502.9(c)(1)(ii). This duty to supplement applies whether the agency has prepared an EIS or an

16  EA. *Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 566 n.2 (9th Cir. 2000).

17  **        A.    BLM Failed to Take a Hard Look at the New Information in the Monograph**
18  **              and FWS's "Warranted But Precluded" Findings.**
19

20      "When new information comes to light the agency must consider it, evaluate it, and

21  make a reasoned determination whether it is of such significance as to require implementation of

22  formal NEPA filing procedures." *Friends of the Clearwater*, 222 F.3d at 558. *See also Marsh v.*

23  *Ore. Natural Res. Council,* 490 U.S. 360, 385 (1989) (agency that has received publications

24  purporting to contain new information "ha[s] a duty to take a hard look at the proffered

25  evidence.")

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --19

1        In reviewing a decision not to issue supplemental NEPA analysis, "courts should not

2   automatically defer" to the agency, but rather should "carefully review [] the record and satisfy []

3   themselves that the agency has made a reasoned decision based on its evaluation of the

4   significance . . . of the new information." *Marsh,* 490 U.S. at 378. The Court should consider

5   "the environmental significance of the new information, the probable accuracy of the

6   information, the degree of care with which the agency considered the information and evaluated

7   its impact, and the degree to which the agency supported its decision not to supplement with a

8   statement of explanation or additional data." *Warm Springs Dam Task Force v. Gribble*, 621

9   F.2d 1017, 1024 (9th Cir. 1980).

10       BLM failed to provide a convincing explanation for its conclusions that the information

11  in the FWS' March 2010 "warranted but precluded" findings is insignificant. BLM stated, "the

12  findings do not present any new information specific to sage-grouse habitats or populations on

13  these allotments that would warrant . . . supplemental analysis." Yet, in the same breath, BLM

14  acknowledged "the importance of the Service's recent findings," admitting that the first factor

15  cited above weighs in favor of conducting supplemental NEPA analysis. BLM reiterated the

16  Bodie EA's conclusion that "conditions for sage-grouse are expected to be maintained or

17  improved," but did not explain why it still considered that conclusion supportable in view of the

18  new information in FWS's findings.  Likewise, BLM pointed out that the sage-grouse was

19  considered a BLM sensitive species in 2008, but did not explain why this fact somehow renders

20  insignificant the information in the "warranted but precluded" findings. BLM's failure to explain

21  its conclusions shows a low degree of care rather than the hard look required by NEPA.

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --20

1    With regard to the Monograph, BLM failed to consider or evaluate the new information

2    —or even look at the document.[3] *See* A.R. 4, 42; Docket No. 65, 4-5 (Nov. 16, 2011). BLM was

3    unaware what the new information in the Monograph was, and thus could not supply any

4    explanation, much less a reasonable one, for refusing to supplement its NEPA analysis.

5    BLM bears the responsibility of complying with NEPA by evaluating potentially

6    significant new information, rather than relying on groups (like WWP) to bring it to the agency's

7    attention. As the Ninth Circuit has explained, "It is the agency, not an environmental plaintiff,

8    that has a 'continuing duty to gather and evaluate new information relevant to the environmental

9    impact of its actions,' even after release of an EIS." *Friends of the Clearwater*, 222 F.3d at 558-

10   59 (internal citations omitted) (holding Forest Service violated NEPA by failing to consider

11   whether the designation of seven sensitive species required supplemental analysis, even though

12   the plaintiffs never identified these designations as significant new information); *Oregon Natural*

13   *Res. Council Action v. U.S. Forest Serv.,* 445 F. Supp. 2d 1211, 1228 (D. Or. 2006) (rejecting

14   agency's argument that it was only required to consider information submitted by the plaintiffs in

15   conducting supplemental NEPA analysis).

16   WWP brought the Monograph to BLM's attention, directed BLM to where it could be

17   downloaded, and explained that the Monograph contains significant new information. This was

18   more than sufficient to trigger BLM's duty to consider the information in the Monograph.

19   **B.    FWS's "Warranted But Precluded" Findings and the Monograph Contain**
20   **        Significant New Information.**
21
22   Information is significant – and requires supplemental NEPA analysis – if it "is sufficient

23   to show that the remaining action will 'affec[t] the quality of the human environment' in a

---

[3] This fact distinguishes the present case from *ONDA v. BLM*, 08-CV-1271-KI (D. Or. 2011) where BLM reviewed the Monograph and determined that it did not present significant new information relevant to a vegetation modification project.

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --21

1  significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374.

2  An agency determines the "significance" of new information by considering the context of the

3  action and the intensity of the action's impact. 40 C.F.R. § 1508.27; *Friends of the Clearwater*,

4  222 F.3d at 557, n.4.  To do so, the agency must evaluate ten factors established by the Council

5  on Environmental Quality. 40 C.F.R. § 1508.27(b). The presence of one intensity factor alone

6  may render the proposed action significant. *Ocean Advocates v. U.S. Army Corps of Engineers,*

7  402 F.3d 846, 865 (9th Cir. 2005); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722,

8  731 (9th Cir. 2001).

9        **1.**     **Information in the Monograph and "warranted but precluded" findings**
10                **shows a high risk of extinction to the Bi-State DPS.**

11

12         The new information in the Monograph and "warranted but precluded" findings is

13  significant because it shows the Bi-State DPS of sage-grouse is at greater risk of extinction than

14  considered in the Bodie EA.

15         The degree to which an action may adversely affect an endangered or threatened species

16  is one of the factors that an agency must consider in determining an action's significance. 40

17  C.F.R. § 1508.27(b)(9).  New information that shows a threat of extirpation to a species requires

18  the preparation of supplemental NEPA. *See Or. Natural Res. Council*, 445 F. Supp. 2d at 1226

19  (new information showing 4-7% rate of decline of northern spotted owl populations was

20  significant); *Sierra Club v. Bosworth*, 05-CV-397-CRB, 2005 WL 2204986, at * 4-5 (N.D. Cal.

21  2005) (recent academic studies and ESA listing of the marbled murrelet "confirm[ing] that there

22  is a real threat of extinction" to an isolated, genetically distinct population "is precisely the type

23  of change in the 'biological status' of a threatened animal that creates a duty to timely evaluate

24  the necessity of a supplemental environmental review"). *Cf. Swanson v. U.S. Forest Serv.,* 87

1  F.3d 339, 344 (9th Cir. 2006) (supplemental NEPA analysis not required where listing changed

2  "the legal status of the salmon, but it did not change the biological status.")

3      As in *Sierra Club*, the Monograph and FWS's "warranted but precluded" findings

4  determined that the Bi-State DPS faces imminent threats of high magnitude. Threats to the Bi-

5  State DPS are magnified by its small size and geographic isolation. SOF ¶ 77. Statistical analysis

6  shows populations in the Mono Basin have declined 35% and 49% since 1965, and researchers

7  have found the adult survival rate for sage-grouse is already below the level of sustainability in

8  the Bodie Hills. SOF ¶¶ 70, 80.

9      Also like *Sierra Club*, the agency's original analysis did not consider the "biological

10  importance" of the population at issue, which "post-[decision] studies found to be genetically

11  distinct." 2005 WL 2204986, at *5.  While the Bodie EA mentions that the Bi-State population

12  may be genetically distinct, the EA did not consider the implications of the population's genetic

13  uniqueness, isolated location, or small population. *See* Bodie EA at 1324-28.

14      **2.     New information about West Nile virus has made impacts highly uncertain.**
15
16      The Monograph and "warranted but precluded" findings further revealed that WNv is a

17  greater threat to the Bi-State DPS than previously understood and rendered the impacts of the

18  Bodie Hills grazing decisions "highly uncertain."

19      An agency action may be significant when it involves highly uncertain or unknown risks.

20  40 C.F.R. § 1508.27(b)(5). An action becomes "highly uncertain" when new information raises

21  substantial questions about the project's environmental impacts not addressed in the agency's

22  existing analysis. For instance, in *Blue Mountains Biodiversity Project,* 161 F.3d at 1213-14, the

23  testimony of a single tree expert that the logging technique approved by the Forest Service might

1  have a "profound influence" on the redwood sequoia population introduced a level of

2  "uncertainty" requiring the preparation of an EIS. *Id*.

3       Here, the Monograph and FWS's "warranted but precluded" findings reveal that WNv

4  poses a significant threat to the Bi-State DPS.  FWS found that outbreaks of WNv are likely to

5  recur, that outbreaks in small subpopulations like those in the Bi-State DPS can lead to

6  extirpation, and that the loss of these subpopulations threatens the persistence of the Bi-State

7  DPS.  SOF ¶ 78. The Monograph further reveals that artificial stock tanks, water developments,

8  and water-filled hoof prints provide breeding habitat for mosquitoes. SOF ¶ 71. Thus, the

9  presence of livestock near water developments during the hot days of summer—the same season

10 when sage-grouse congregate near water—may increase the risk of a WNv outbreak.

11      This new information about WNv raises substantial questions about the impacts of the

12 Bodie Hills grazing decisions, which authorize grazing on three allotments during the hot season

13 and promote "better livestock distribution" through reliance on artificial water developments.

14 SOF ¶ 68. These impacts are all the more uncertain because the Bodie EA failed to analyze the

15 risk of WNv in the first place. In view of this uncertainty, BLM must prepare a supplemental

16 NEPA document to analyze the extent to which the grazing decisions will contribute to the

17 spread of WNv and how that will affect the Bi-State DPS.

18        **3.     Information in the Monograph and "Warranted But Precluded" Findings**
19              **rendered the grazing decisions' impacts highly controversial.**
20
21      The information in the Monograph and "warranted but precluded" findings is also

22 significant because it shows that, contrary to BLM's assumption in the Bodie EA, livestock

23 grazing is a threat to sage-grouse in the Bodie PMU.

24      In determining the significance of an action, BLM must consider the extent to which the

25 action is "highly controversial." 40 C.F.R. § 1508.27(4). An action becomes "highly

1   controversial" when new information creates a substantial dispute about the size, nature, or effect

2   of the major Federal action . . .'" *Sierra Club v. U.S. Forest Serv.,* 843 F.2d 1190, 1193 (9th Cir.

3   1988).

4          The Bodie EA assumed that livestock grazing in the Bodie PMU was a "manageable

5   risk." Bodie EA at 1267.  FWS's March 2010 findings refuted this assumption, finding that

6   grazing in the Bodie PMU has a negative effect on sage-grouse and grazing thus "contributes to

7   the risk of extirpation of some local populations, which in turn contributes to increased risk to

8   the persistence of the Bi-State DPS." SOF ¶ 81. The "warranted but precluding" findings thus

9   created a dispute about the grazing decisions' impacts that requires supplemental NEPA analysis.

10         For all of the reasons set forth above, BLM's refusal to supplement its NEPA analysis for

11  the Bodie Hills grazing decisions violated NEPA.

12                                         **CONCLUSION**

13         For the foregoing reasons, the Court should grant the Plaintiffs' Motion for Summary

14  Judgment; reverse and set aside the Bodie Hills EA, FONSI, and grazing permits; and set a

15  briefing schedule to determine appropriate remedies.

16  Dated: December 7, 2011                              Respectfully submitted,

17

18                                                      /s/ Natalie J. Havlina
19                                                      Natalie J. Havlina
20                                                      Attorney for Plaintiffs

21

1
<b><u>CERTIFICATE OF SERVICE</u></b>

2        I hereby certify that on this 7th day of December 2011, I caused the foregoing Opening

3 Brief in Support of Plaintiffs' Motion for Summary Judgment to be electronically filed with the

4 Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the

5 counsel of record listed below:

6 J. Earlene Gordon                         William E. Peterson
7 earlene.gordon@usdoj.gov                  wep@morrislawgroup.com
8
9 Suellen Fulstone                          Brandon L. Jensen
10 sf@morrislawgroup.com                     brandon@buddfalen.com
11
12 Karen Budd-Falen                          Deborah A. Sivas
13 Karen@buddfalen.com                       dsivas@standford.edu
14
15 Leah Russin                              Alicia Thesing
16 leah.russin@law.stanford.edu             athesing@stanford.edu
17
18
19
20                                          /s/ Natalie J. Havlina

21

PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF --26