IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WESTERN WATERSHEDS
PROJECT, et al.,

           Plaintiffs,                    No. 2:10-CV-02896-KJM-KJN

    vs.

BUREAU OF LAND
MANAGEMENT,

           Defendant,

FLYING M RANCH, et al.,

           Defendant-Intervenors

<u>ORDER</u>

_____/

       This matter is before the court on the parties' cross motions for summary judgment.  (ECF 77, 83, 84, 87.)  Plaintiffs assert BLM's renewal of grazing permits in Eastern California violates the Federal Land Policy and Management Act and the National Environmental Policy Act.  The court held hearing on the motions on March 14, 2012.  Natalie Havlina appeared for plaintiffs, J. Earlene Gordon appeared for defendant Bureau of Land Management ("BLM"), Brandon Jensen appeared for defendant-intervenor Flying M Ranch ("Flying M"), and Suellen Fulstone appeared for defendant-intervenor R.N. Fulstone Company ("Fulstone") (collectively, "defendant-intervenors").  Having reviewed the parties' briefs and considered their arguments,

1

and reviewed the substantial administrative record in this case, for the reasons below, the court GRANTS in part and DENIES in part each motion.

I.      FACTUAL AND PROCEDURAL BACKGROUND

BLM has authority under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701, *et seq.*, to issue livestock grazing permits for federal lands. *See* 43 C.F.R. § 4100.0-1, *et seq.*  Grazing permits generally are valid for ten years and may be renewed. *Id.* §§ 4110.1(b)(1), 4130.2.  Under BLM's grazing regulations, grazing is managed "on public lands under the principle of multiple use and sustained yield, and in accordance with applicable land use plans." 43 C.F.R. § 4100.0-8.  Grazing permits are required to have "terms and conditions determined by the authorized officer to be appropriate to achieve management and resource condition objectives for the public lands and other lands administered by the [BLM] . . . ." *Id.* § 4130.3.  Such terms and conditions include "the kind and number of livestock, the period(s) of use, the allotment(s) to be used, and the amount of use, in animal unit months, for every permit or lease." *Id.* § 4130.3-1(a).

Three sets of standards, established by BLM in accordance with the FLPMA, are relevant to this action.  The broadest standards are the "Central California Standards and Guidelines for Livestock Grazing" ("Central California Standards" or "Rangeland Health Standards"), which contain the management standards and guidelines for the entire Central California geographical area.  (Doc. 186: AR[1] 5777); 43 C.F.R. § 4180.2.  The Central California Standards set standards for watershed function, ecological processes, water quality, and habitats of protected species.  (Doc. 186: AR 5780.)  These Standards apply only when a grazing allotment is not meeting certain criteria defined by the Standards themselves.  (Doc. 186: AR 5791.)

---

[1]  "Doc." refers to the document number BLM assigned to the documents that make up the administrative record.  A copy of the administrative record ("AR") was lodged with the court. (ECF 39, 58, 78.)  A citation to "Doc." followed by a citation to "AR" references the document number in which the cited AR page appears.

Second, the 1993 Bishop Resource Management Plan ("Bishop RMP") applies to a smaller geographic area.  (*See* Doc. 233: AR 8873.)  The Bishop RMP is administered by the Bishop Field Office, which manages 750,000 acres of land in Eastern California's Inyo and Mono counties.  (Doc. 233: AR 8881, 8971–8973; Doc. 49: AR 1269.)  A total 606,000 acres of this land, divided into 58 allotments, are open to grazing.  (*See* Doc. 49: AR 1269.)  The Bishop RMP defines mandatory conditions for grazing on these allotments.  (Doc. 233: AR 8890–8902, AR 8967–8977.)

The most specific standards relevant to this case are the challenged grazing permits themselves, which were issued by the Bishop Field Office in 2010.  (Doc. 9; Doc. 13.)  The Bishop Field Office's 58 grazing allotments are grouped into nine management areas.  The challenged grazing permits relate to the Bodie Hills Management Area ("Bodie Hills"), which encompasses 121,150 acres of public lands located north of Mono Lake.  (Doc. 233: AR 8910.)  Plaintiffs challenge BLM's renewal of grazing permits on four specific allotments within the Bodie Hills Management area: the Bodie Mountain, Mono Sand Flat, Potato Peak and Aurora Canyon allotments (collectively, "Bodie Hills allotments").  (*See* Compl., ECF 1.)  Defendant-intervenor Fulstone is the permit-holder for the Potato Peak and Aurora Canyon allotments, and defendant-intervenor Flying M holds permits for the Bodie Mountain, and Mono Sand Flat Allotments.  (Doc. 1: AR 1; Doc. 9: AR 166).

Before BLM renewed the permits for the Bodie Hills allotments, in September 2008, BLM issued an environmental assessment ("EA") analyzing the anticipated environmental impacts of renewal.  (*See* Doc. 49: AR 1238.)  Prior to issuing the final EA, BLM published a draft version for public comment.  Plaintiff Western Watersheds suggested changes to the draft EA, which BLM considered and addressed in the final EA.  (Doc. 53: AR 1374; Doc. 49: AR 1238.)

BLM has designated two of the species known to inhabit the Bodie Hills allotments as "sensitive species": the greater sage grouse (*centrocercus urophasianus*) and the pygmy rabbit (*brachylagus idahoensis*).  (Doc. 49: AR 1323–1330.)  The Bishop RMP contains

provisions to protect these sensitive species. (Doc. 233: AR 8897.)  Among these prescriptions are required yearlong and seasonal protections of these animals' habitats.

In 2003, several parties, including plaintiff Western Watersheds, petitioned the U.S. Fish and Wildlife Service to list the pygmy rabbit as endangered or threatened under the Endangered Species Act.  (Doc. 3: AR 6.)  In 2005, the U.S. Fish and Wildlife Service ("FWS") published a 90-day finding in the Federal Register, which stated that listing was not warranted.  (*Id.*)  The federal court for the District of Idaho vacated and remanded the finding, ordering FWS to issue a new finding on or before December 26, 2007.  *W. Watersheds Project v. Norton*, CV 06-00127SEJL, 2007 WL 2827375 (D. Idaho Sept. 26, 2007).  FWS issued the new 90-day finding on January 8, 2008, stating "that the petition presented substantial information indicating that the petitioned action may be warranted" and initiating a 60-day public comment period.  (Doc. 3: AR 6.)  On September 30, 2010, the FWS issued a proposed finding that listing was not warranted.  (*Id.*)

Plaintiffs filed their complaint challenging BLM's renewal of the grazing permits on October 26, 2010.  Plaintiffs' two claims allege BLM's actions violated the 1) FLPMA and 2) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*[2]  The court will address each of these claims in turn after addressing the threshold jurisdictional issues of exhaustion and standing.

II.     JURISDICTION

A.     Issue Exhaustion

Defendant-intervenors Flying M and Fulstone contend this court cannot entertain plaintiffs' FLPMA claim because plaintiffs did not raise their FLPMA arguments during the administrative process.  Flying M and defendant BLM argue this court lacks jurisdiction to hear any claims brought by plaintiffs that were not raised during the administrative process.  (ECF 83-1 at 12–13; ECF 84-1 at 17–18.)  Fulstone similarly argues plaintiffs did not raise the issue of

---

[2] Plaintiffs' complaint also alleges that BLM violated its Special Status Species Policy.  As the court addresses more fully below, plaintiffs appear to have abandoned their third cause of action alleging violation of the FLPMA through violation of BLM's Special Status Species Policy.

the contested grazing decisions violating the Bishop RMP at any time during the administrative

process, but asserts instead that this lapse means plaintiffs' FLPMA claim fails as a matter of law.

(ECF 87-1 at 21–22.)   The court construes defendant-intervenors' arguments as raising issue

exhaustion only.  If defendant-intervenors also are arguing exhaustion of administrative remedies,

the court finds this argument has no merit.  Plaintiffs challenging BLM grazing decisions in this

Circuit are not required to exhaust administrative remedies.  *W. Watersheds Project v. Salazar*,

843 F. Supp. 2d 1105, 1123 (D. Idaho 2012) (citing *Idaho Watersheds Project v. Hahn*, 307 F.3d

815, 827–28 (9th Cir. 2002)).

   Plaintiffs are two regional not-for-profit conservation organizations dedicated to

protecting the Western United States' natural resources.  (Compl. ¶¶ 11–12.)  Plaintiffs argue that

defendant-intervenors confuse exhaustion of administrative remedies with issue exhaustion, that

the FLPMA does not require exhaustion of administrative remedies, and that issue exhaustion is

not applicable to their FLPMA claim.  (ECF 90 at 18–22.)

   Defendant-intervenors cite *Vermont Yankee Nuclear Power Corp. v. Natural

Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978), and related cases to contend plaintiffs

are barred from raising claims before this court that were not raised in the administrative process.

(*See, e.g.*, ECF 83-1 at 12; ECF 84-1 at 24; ECF 87-1 at 22.)  Under *Vermont Yankee* and its

progeny, parties "challenging an agency's compliance with NEPA must structure their

participation so that it . . . alerts the agency to the [parties'] position and contentions, in order to

allow the agency to give the issue meaningful consideration."  *Dept. of Transp. v. Pub. Citizen*,

541 U.S. 752, 764 (2004) (internal quotations and citation omitted).  Plaintiffs argue this line of

cases is distinguishable on two grounds.  First, these cases' exhaustion holdings are applicable

only to NEPA, and in the instant case defendant-intervenors' exhaustion arguments relate only to

the FLPMA.  (ECF 90 at 20–21.)  Second, the Ninth Circuit has refused to apply the *Vermont

Yankee* doctrine to other statutes.  (*Id.* at 20 (citing *Nw. Envir. Def. Ctr. v. Bonneville Power

Admin.*, 117 F.3d 1520, 1535 (9th Cir. 1997)) ("*NEDC*").)  In short, plaintiffs contend defendant-

intervenors do not cite any legal authority requiring plaintiffs to exhaust their FLPMA claims

prior to seeking judicial review.  (*Id.* at 21.)

While specific guidance on issue exhaustion has been provided for certain statutes like NEPA, *see, e.g. Pub. Citizen.*, 541 U.S. at 764–65, no bright line standard for FLPMA issue exhaustion exists in the Ninth Circuit. *See Or. Natural Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1159 (D. Or. 2011) (surveying issue exhaustion cases in this Circuit and holding plaintiffs satisfied FLPMA issue exhaustion requirement).  As a general rule, courts in this Circuit will consider only those issues that were "presented before an administrative proceeding at the appropriate time." *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1065 (9th Cir. 2009) (quoting *Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir. 1986)) (internal quotations omitted).  However, this general exhaustion requirement should be interpreted "broadly": it is fulfilled if plaintiffs' appeal "provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Id.* (quoting *Native Ecosystems v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002)) (internal quotations omitted).  Plaintiffs are not required to raise an issue in precise legal terms. *Id.* Thus, even "general objection[s]" to an agency action under the FLPMA can suffice if the objections, taken as a whole, provide the agency sufficient notice so that the agency can resolve the claim. *McDaniel*, 751 F. Supp. 2d at 1163–64 (citing *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965–66 (9th Cir. 2002) and *Native Ecosystems Council*, 304 F.3d at 899).  However, general objections that are too attenuated from the issues raised before the district court will not suffice. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 967 (9th Cir. 2006).

Plaintiff Western Watersheds Project ("WWP") raised objections to BLM's contested July 27, 2009 grazing decisions at several administrative stages.  On July 23, 2008, WWP objected to the EA for livestock grazing on the Bodie Hills allotments.  (Doc. 53: AR 1374–1390.)  In its objection letter, WWP repeatedly referenced FLMPA requirements and discussed its concern for the welfare of the sage grouse and the pygmy rabbit in light of the impacts that livestock grazing on the allotments would have on these two species, impacts such as trampling and loss of vegetative cover.  (Doc. 53: AR 1377–1380, 1383–1384.)  WWP also protested the proposed grazing decisions on October 17, 2008, stating that the revised EA "acknowledg[es] that livestock grazing impacts sage grouse, pygmy rabbit, and the American

6

1    pika" but "failed to fully analyze the site-specific impacts of the proposed action on these species

2    or their habitat . . . ."  (Doc. 42: AR 1178.)  Finally, in its August 28, 2009 appeal of the final

3    grazing decisions, WWP reiterated the above concerns, referenced the fact that the governing land

4    use plan is the Bishop RMP, and included language from the EA, which stated the Bishop RMP

5    controls the height requirement for riparian vegetation.  (Doc. 31: AR 702, 712.)

6            Defendant-intervenors correctly note these objections do not contain the specific

7    arguments plaintiffs assert before this court.  Flying M takes the position that WWP's general

8    comments to the agency about alleged impacts of grazing on wildlife habitat are too attenuated

9    from WWP's FLPMA arguments in this action, that BLM is not providing yearlong and seasonal

10   protections to sage grouse and pygmy rabbit habitat as required specifically by the Bishop RMP.

11   (ECF 83-1 at 13–14.)  At hearing, counsel for Fulstone similarly argued that WWP never claimed

12   in its arguments at the administrative level that BLM violated the FLPMA specifically by

13   infringing the Bishop RMP's seasonal and yearlong protection requirements.  The question this

14   court must resolve is whether WWP's objections are too general to have provided BLM sufficient

15   notice to resolve the more specific claims now before this court.

16            In *McDaniel*, the plaintiff argued a BLM decision to open to motorized travel

17   certain routes in a Wilderness Study Area ("WSA") that had fallen into obscurity violated the

18   FLPMA's non-impairment requirement.  751 F. Supp. 2d at 1163–64.  The defendant argued the

19   plaintiff had failed to exhaust the FLPMA non-impairment issue because "it only complained

20   about the designation of public-access 'Obscure Routes' within the WSAs" in an appeal of the

21   BLM's decision.  *Id.*  The plaintiff had not mentioned other types of routes, such as permittee-

22   only routes, and had not specified which part of the FLPMA the BLM's decision violated.  *See id.*

23   at 1164.  While the court characterized plaintiff's statements as a "general objection" to the

24   challenged BLM action, the court held that "such imprecise formulations can satisfy the issue

25   exhaustion requirement" because plaintiff's administrative appeal, "'*taken as a whole*, provided

26   sufficient notice' to the IBLA of [plaintiff's] objection to the [] designation of new routes within

27   the WSAs."  *Id.* (quoting *Native Ecosystems Council*, 304 F.3d at 899) (original emphasis).

28

                                            7

In *Hankins*, the court affirmed in part and reversed in part the district court's holdings on issue exhaustion. 456 F.3d at 967. The plaintiff challenged BLM's approval of two gold mining permits. *Id.* at 960. During the permit proposal phase, the plaintiff had made "general comments" about the mining's impact on groundwater, springs, and seeps, and it had expressed concern about the current and future levels of toxins such as arsenic in the discharged water. *Id.* at 965–67. Before the district court, the plaintiff argued more specifically that granting the mining permits violated, among other things, the FLPMA and Public Water Reserve No. 107, the latter of which was issued by Executive Order in 1926. *Id.* Reversing the district court, the court held these general comments were sufficient to exhaust the plaintiff's FLPMA claims because the plaintiff "clearly expressed concern about the current and future levels of toxins in the discharged water, and the [BLM] was on notice of these concerns." *Id.* at 965. However, the district court correctly held that plaintiff's claim under the 1926 Executive Order was not exhausted, because the plaintiff's general comments about groundwater, springs, and seeps "in no way suggest an argument that the Bureau failed to protect federally-reserved water rights under an eighty-year-old Executive Order." *Id.* at 967.

Here, the court concludes WWP exhausted its FLPMA claims.[3] While WWP did not specifically argue that the grazing permits violated the FLPMA by infringing the Bishop RMP's seasonal and yearlong requirements, WWP stated generally that it was concerned about livestock grazing's impacts on the sage grouse and pygmy rabbit inhabiting the Bodie Hills allotments. (Doc. 53: AR 1377–1380, 1383–1384.) WWP also protested that BLM had not conducted site-specific analyses of grazing's impacts on these species' habitats. (Doc. 42: AR 1178.) Moreover, WWP clearly referred to the FLPMA and the Bishop RMP as containing the controlling requirements for grazing decisions. (Doc. 31: AR 702, 712, 714, 716–717.) As with the FLPMA arguments in *McDaniel* and *Hankins*, WWP's statements taken as a whole are sufficient to put BLM on notice of the concerns WWP more specifically elucidates in this action.

---

[3] Because plaintiffs appear to have abandoned their cause of action alleging violation of the FLPMA through violation of BLM's Special Status Species Policy, the court makes no finding on whether WWP exhausted its claims under that cause of action.

8

1   Furthermore, the Bishop RMP is the land use plan that governs the Bodie Hills allotments where

2   the grazing at issue in this case takes place, not analogous to an obscure eighty-year-old executive

3   order.  *See Hankins*, 456 F.3d at 967.

4            At the same time, it is undisputed that plaintiff Wild Earth Guardians ("WEG")

5   did not participate in the administrative process.  The court therefore addresses WEG's ability to

6   persist as a party in this action separately below.

7            B.       Standing

8            Plaintiffs assert that because plaintiff WWP has standing, it is unnecessary to

9   consider whether plaintiff WEG has standing.  (ECF 90 at 44 n.15 (citing *Slockish v. U.S. Fed.*

10  *Highway Admin.*, 682 F. Supp. 2d 1178, 1186 (D. Or. 2010) (citing *Nat'l Ass'n of Optometrists &*

11  *Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009)).)  At hearing,

12  defendant-intervenors contested this assertion, arguing that permitting such piggyback standing

13  would allow unfair leveraging of attorney's fees provisions and the right to appeal.

14            Authorities supporting each side's positions exist.  *Slockish* and *Brown* hold that as

15  a general matter a court in an injunctive relief case need not address each plaintiff's standing if it

16  concludes that one plaintiff has standing.  *See also Sierra Club v. El Paso Props., Inc.*, No. 01–

17  cv–02163–BNB–MEH, 2007 WL 45985, at *3 (D. Colo. Jan. 5, 2007) (no need to consider

18  standing for multiple plaintiffs because both were "represented by the same counsel, raise the

19  same Clean Water Act claims, and have presented their arguments to the court jointly throughout

20  these proceedings . . . .").)  However, this general rule does not bar a court from considering

21  whether other plaintiffs have standing in cases with multiple plaintiffs.  *We Are America/Somos*

22  *America, Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1090–94 (D.

23  Ariz. 2011) (considering defendant's motion to dismiss organizations and taxpayers separately for

24  lack of standing and determining some did not have standing).

25            Because the parties do not dispute that plaintiff WWP has standing, the court finds

26  it need not reach whether plaintiff WEG has standing.  Defendant-intervenors did not separately

27  move to dismiss plaintiff WEG for lack of standing, as did the defendants in *Somos America*, and

28  defendant-intervenors' concerns about attorney's fees and rights to appeal expressed at hearing

are unfounded.  Because both plaintiffs have retained the same counsel and assert identical

claims, there is no reason to fear additional attorney's fees would be awarded should plaintiffs

prevail.  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 918 (9th Cir. 2004).  While

WEG could seek to appeal this court's order, if it did so independently of plaintiff WWP then

WEG's independent standing would be considered at that juncture.  *Cf. Leonard v. Clark*, 12 F.3d

885, 888 (9th Cir. 1993) (finding that the district court's determination that one organizational

plaintiff had standing normally would end the standing inquiry, but because the appellate court

determined on appeal that the organizational plaintiff had waived its claims, the appellate court

considered the standing of the other individual plaintiffs).

Finally, the court denies BLM's motion to strike WWP's extra-record declarations,

which WWP claims are submitted to supplement the record on standing.  Courts may consider

such declarations "not in order to supplement the administrative record on the merits, but rather to

determine whether petitioners can satisfy a prerequisite to this court's jurisdiction."  *Bonneville

Power Admin.*, 117 F.3d at 1528; s*ee also Natural Res. Def. Council, Inc. v. U.S. Forest Serv.*,

634 F. Supp. 2d 1045, 1053 (E.D. Cal. 2007) (denying motion to strike declarations and

disavowing reliance on the declarations except as they were relevant to standing); *Karuk Tribe of

Cal. v. U.S. Forest Serv.,* 379 F. Supp. 2d 1071, 1088 (N.D. Cal. 2005), *rev'd on other grounds,*

681 F.3d 1006 (9th Cir. 2012) (holding extra-record declaration permissible to establish standing,

even though neither defendants nor intervenors contested standing).

III.    <u>APA STANDARD OF REVIEW</u>

The court reviews final agency actions under the Administrative Procedure Act

("APA"), 5 U.S.C. § 701, *et seq*.  The court does not determine whether there are disputed issues

of material fact as it would in a typical summary judgment proceeding; its review is based on the

administrative record.  5 U.S.C. § 706(2)(F); *Nw. Motorcycle Ass'n v. U.S. Dept. of Agriculture*,

18 F.3d 1468, 1472 (9th Cir. 1994); *see also South Yuba River Citizens League v. Nat'l Marine

Fisheries Serv.*, 723 F. Supp. 2d 1247, 1256 (E.D. Cal. 2010) (usual summary judgment standards

do not apply).  The court must consider whether the agency's actions, findings and conclusions

are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . . ."

5 U.S.C. § 706(2)(A).  The court's inquiry must be "searching and careful, but the ultimate

standard is a narrow one."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal

quotations and citation omitted).

> Under this narrow standard, a decision is arbitrary and capricious
> only if the agency relied on factors Congress did not intend it to
> consider, entirely failed to consider an important aspect of the
> problem, or offered an explanation that runs counter to the evidence
> before the agency or is so implausible that it could not be ascribed
> to a difference in view or the product of agency expertise.

*Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (internal quotations and citation

omitted).  "In making this inquiry, [the court asks] whether the agency considered the relevant

factors and articulated a rational connection between the facts found and the choice made."

*Natural Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997)

(quotations and citation omitted).

IV.   <u>REVIEW OF CLAIMS AND ANALYSIS</u>

    A.   First Cause of Action: NEPA

        NEPA requires agencies to take a "hard look at the environmental consequences"

of their proposed actions by analyzing their environmental impacts and considering potential

alternatives.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (internal

quotations and citations omitted); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916–17

(9th Cir. 2012); *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S.

Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012).  NEPA does not require the agencies' decision

making process to lead to a particular outcome; it requires agencies to conform to a particular

procedure.  *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir.

2008).  Rather than reviewing whether the agency reached the correct decision, a court "must

consider whether the decision was based on a consideration of the relevant factors and whether

there has been a clear error of judgment."  *Westlands Water Dist. v. U.S. Dept. of Interior*, 376

F.3d 853, 865 (9th Cir. 2004) (quoting *Marsh*, 490 U.S. at 378).

        NEPA requires federal agencies, such as BLM, to prepare an Environmental

Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332.  If the action will not significantly affect the quality of the human environment, the agency may instead issue a Finding of No Significant Impact ("FONSI") after conducting an Environmental Assessment ("EA") of the project.   40 C.F.R. §§ 1501.4, 1508.13.  An EA is a "concise public document" that briefly "provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." 40 C.F.R. § 1508.9.  Although NEPA regulations require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," 40 C.F.R. § 1506.6, there is no requirement that in every case, a draft EA be circulated to the public before a final EA is issued.  *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008).  However, a draft EA is one way in which an agency can provide the public with environmental information.  *Id.* at 953.  "If an agency decides not to prepare an EIS, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant. The statement of reasons is crucial to determining whether the agency took a hard look at the potential environmental impact of a project." 349 F.3d 1157, 1220 (9th Cir. 2003) (citations and internal quotation marks omitted).

Plaintiffs allege that the BLM's Draft EA prepared in July 2008 for the Bodie Hills allotments grazing decisions violated NEPA in several ways.  They claim that 1) BLM did not analyze a sufficient range of alternatives to the proposed action; 2) BLM did not take a hard look at the impacts of grazing on the pygmy rabbit or sage grouse; and 3) BLM should have conducted supplementary analysis after the EA was issued.  The court considers each of these claims in turn.

1.    Range of Alternatives

 "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS . . . ."  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005)).  "[W]ith an EA, an agency only is required to include a brief discussion of reasonable alternatives. *See* 40 C.F.R. § 1508.9(b)."  *Ctr. for Biological Diversity*, 695 F.3d at 915 (citation and quotations omitted).  NEPA requires BLM to "consider or properly reject proposed alternatives."  *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006); *Envtl.*

*Prot. Info. Ctr.*, 451 F.3d at 1016.  In rejecting any alternatives, the agency must only include "brief discussions of the need for the proposal, of alternatives required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Native Ecosystems Council*, 428 F.3d at 1246.  "So long as 'all reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied." *Id.* at 1246.  An analysis of the reasonableness of the agency's range of alternatives begins with the EA's stated purpose. *Id.*

Plaintiffs allege that BLM violated NEPA because the Final EA did not consider an alternative that would require grazing to continue at a reduced stocking rate.  (ECF 77-1 at 19.)  BLM asserts that the number of alternatives it considered was sufficient and that plaintiffs do not explain how the alternatives plaintiffs proposed would meet the requirements of the Bishop RMP. (ECF 84-1 at 27–28.)

The Draft EA analyzed three alternatives.  Alternative One, the Proposed Action, would "authorize grazing for 10-years on the Bodie Mountain, Mono Sand Flat, Potato Peak, and Aurora Canyon allotments with applicable terms and conditions and other provisions . . . ." (Doc. 56: AR 1405.)  Alternative Two, the No Action Alternative, would "issu[e] new 10-year permits with the same terms and conditions as under the existing authorizations."  (Doc. 56: AR 1410.) Alternative Three, the No Grazing Alternative, "would cancel the permit for the Bodie Mountain and Mono Sand Flat allotments, and the permit for the Potato Peak and Aurora Canyon allotments.  As a result, grazing would not be authorized on these allotments."  (Doc. 56: AR 1412.)  After the Draft EA was published, plaintiff WWP submitted comments to BLM recommending that BLM "analyze an alternative based on reduced stocking rates."  (Doc. 53: AR 1376.)  BLM issued its Final EA on September 30, 2008.  (Doc. 49.)

The stated purpose of the Final EA was "to consider whether to authorize grazing for 10 years on the Bodie Mountain, Mono Sand Flat, Potato Peak and Aurora Canyon allotments" and to "ensure that the grazing authorizations implement provision [sic] of, and are in conformance with, the [RMP] and the Secretary of the Interior approved Central California

Standards for Rangeland Health and Guidelines for Livestock Grazing." (Doc. 49: AR 1241.) Plaintiffs do not challenge the reasonableness of the EA's stated purpose; they challenge BLM's refusal to consider an alternative that plaintiffs proposed, to reduce the animal stocking rate.

An agency's refusal to consider proposed alternatives does not mean that an alternatives analysis is deficient, as long as the agency provides an explanation for why the proposed alternative was not considered in depth. *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1022–23 (9th Cir. 2012) (agency's alternatives analysis was not arbitrary and capricious because it explained why the alternative it analyzed was more suitable to achieve the goal of the action than plaintiff's proposed alternative); *Ctr. for Biological Diversity*, 695 F.3d at 916 (approving analysis of only two alternatives where agency explained why it did not consider plaintiff's proposed alternative). In *Native Ecosystems Council*, the court rejected the plaintiffs' challenge to the agency's alternatives analysis because neither of the alternatives plaintiffs suggested would have fit the purpose and need of the project. 428 F.3d at 1247–48.

Plaintiffs argue that BLM's explanation in the Final EA for refusing to consider in depth WWP's proposed stocking rate reduction alternative shows that the alternatives analysis is arbitrary and capricious and can be distinguished from alternatives analyses that have been found acceptable by the Ninth Circuit. In rejecting plaintiffs' suggestion, BLM explained in the Final EA that:

> All of these allotments were found to meet the Secretary of the Interior Approved Rangeland Health Standards and therefore did not warrant such an alternative. Furthermore, the proposed alternative would not be in conformance with the Bishop Resource Management Plan (1993) as amended by the Record of Decision, Central California Standards for Rangeland Health and Guidelines for Livestock Grazing (BLM 2000). Lastly, the proposed alternative did not justify the need for and/or include supporting data or information to warrant such an alternative.

(Doc. 49: AR 1264–1265.) Plaintiffs argue that BLM's reasons for rejecting plaintiffs' alternative are inaccurate. Specifically, plaintiffs contend their proposed alternative was consistent with the

1  Bishop RMP and that the record reveals three of the allotments did not meet Rangeland Health

2  Standards.  (ECF 77-1 at 20.)

3     As indicated in the Final EA, rangeland health assessments were conducted for

4  each of the allotments in either 2001 or 2003, as required under the Rangeland Health Standards.

5  (Doc. 49: AR 1254.)  Six streams located in the Bodie Mountain allotment, two streams on the

6  Aurora Canyon allotment, and one stream on the Potato Peak allotment were designated as

7  "functioning at risk."  (Doc. 147: AR 4614; Doc. 150: AR 4629; Doc. 151: AR 4634.)

8  Nonetheless, BLM rated all the allotments as conforming to the Rangeland Health Standards.

9  (Doc. 147: AR 4615 (Potato Peak); Doc. 150: AR 4630 (Bodie Mountain); Doc. 151: AR 4635

10  (Aurora Canyon).)

11     Additionally, WWP points to an excerpt of the Final EA stating that "[l]ivestock

12  grazing remains a factor influencing many stream reaches falling short of Proper Functioning

13  Condition and Rangeland Health Standards."  (ECF 77-1 at 20 (citing Doc. 49: AR 1309).)  But

14  the Final EA indicates that riparian areas were improving overall.  (Doc. 49: AR 1308.)  Flying M

15  argues that this trend of improving conditions means that BLM was justified in declining to

16  review an alternative that would have reduced stocking rates.  (ECF 83-1 at 19.)

17     On this record, BLM did not act arbitrarily and capriciously in determining it was

18  unnecessary to consider in depth plaintiffs' proposed alternative.  As indicated by the assessments

19  of the allotments completed by BLM's own personnel, the allotments were rated as meeting the

20  Rangeland Health Standards overall and were continuing to improve.  BLM met its obligation to

21  provide a reasonable explanation in the Final EA for choosing not to examine plaintiff's

22  suggestion in depth.  *See Earth Island Inst.*, 697 F.3d at 1022–23.  Because this reason is

23  sufficient to explain why plaintiff's explanation was not considered in depth, the court need not

24  evaluate BLM's contention that plaintiffs' proposed alternative was not consistent with the

25  Bishop RMP.

26  /////

27  /////

28  /////

15

2.      Hard Look at the Impacts on Sensitive Species

Plaintiffs next argue that BLM did not take the required hard look in the Final EA and FONSI because it did not consider all the adverse impacts that the Bodie Hills grazing decisions would have on the pygmy rabbit or sage grouse.  (ECF 77-1 at 22.)

a.      Impact on sage grouse

Plaintiffs advance several criticisms of BLM's analysis of impacts on sage grouse in the Final EA.  Plaintiffs argue that the EA inaccurately described the existing state of sage grouse habitat and omitted potential adverse impacts of the grazing decisions on sage grouse, including the possibility of West Nile Virus.

i.      Existing sage grouse habitat

The Final EA summarizes the current status of sage grouse in the allotments and analyzes the anticipated effect on the sage grouse for each of the three alternatives.  (Doc. 49: AR 1323–1329.)  Plaintiffs argue that, in this section of the Final EA, BLM did not take a hard look at the existing sage grouse habitat or the anticipated impacts of the proposed action on sage grouse. Regarding the preexisting state of sage grouse habitat, plaintiffs assert the Final EA provides that habitat conditions have improved since the 1990s without referencing any supporting studies. (ECF 90 at 27 (citing Doc. 49: AR 1324).)  Moreover, plaintiffs contend, BLM's reliance in the Final EA on results of telemetry studies from between 1999 and 2003 to assess the impact of grazing on sage grouse habitat is improper. (ECF 90 at 27–28.)  Plaintiffs refer to the 2004 Greater Sage-Grouse Conservation Plan for the Bi-State Plan Area of Nevada and Eastern California ("Bi-State Plan"), written by the Governor of Nevada's task force for sage-grouse conservation.  (*See* Doc. 143: AR 4385.)  Plaintiffs assert the Bi-State Plan authors concluded that additional studies were necessary.  But instead of explaining whether additional studies were ever conducted, the Final EA only stated that grazing was not a "high priority risk to sage-grouse." (Doc. 49: AR 1325.)

Plaintiffs do not demonstrate that BLM failed to take a hard look at the preexisting state of sage grouse habitat.  Courts have held that agencies have neglected to take a hard look at environmental impacts when the agencies have insufficiently considered scientific reports

16

relevant to those impacts.  But BLM's treatment of the Bi-State report varies significantly from those cases.  In *Blue Mountains Biodiversity Project v. Blackwood*, citizen groups challenged the U.S. Forest Service's decision not to prepare an EIS when it granted several timber sale contracts in an area burned by wildfire.  161 F.3d 1208, 1213 (9th Cir. 1998).  The EA prepared by the Forest Service in that case did not discuss at all an independent report that found logging in burned areas can harm forest recovery, which "len[t] weight to [the citizen groups'] claim that the Forest Service did not take the requisite 'hard look' at the environmental consequences of post-fire logging . . . ."  *Id.* (alterations in original). The court concluded that Forest Service's lack of references to data either in support of or in opposition to its conclusions in the EA about the environmental impact of logging showed that the Forest Service did not take a hard look at environmental impacts.  *Id.* at 1213-14.  Conversely, in *Hapner v. Tidwell*, where citizen groups challenged the Forest Service's forest-thinning project to reduce area wildfires, the lack of discussion in the EA regarding scientific controversy about the efficacy of such projects did not mean that the Forest Service did not take a hard look.  621 F.3d 1239, 1244 (9th Cir. 2010).  The *Hapner* EA "acknowledge[d] the limits of the benefits that would be provided by the Project" and provided studies supporting the Forest Service's approach.  *Id.* at 1245.

As in *Hapner*, the Final EA fairly discusses the Bi-State Plan's conclusions about the impact of grazing on sage grouse.  (*See* Doc. 49: AR 1325–1329.)  The Bi-State Plan stated that "[p]ermitted livestock grazing is primarily a habitat quality risk in the Bodie PMU."  (Doc. 143: AR 4468.)  The Bi-State Plan noted further that there was little direct scientific evidence connecting grazing to sage grouse population levels, but that there was some evidence that grazing damages sage grouse habitat, and that additional studies regarding the influence of grazing on habitat were needed.  (*Id.*)

Furthermore, plaintiffs take the Bi-State Plan's recommendation for additional research out of context.  In *Center for Biological Diversity v. U.S. Forest Service*, commentators had criticized the agency's scientific conclusions in the draft EIS but the agency did not respond to those comments in the Final EIS.  349 F.3d 1157, 1165 (9th Cir. 2003).  The court held that this violated NEPA regulations requiring responses to valid scientific criticisms to be in the Final EIS.

17

*Id.* at 1167; s*ee also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 489–90 (9th Cir. 2010).  Here, however, the Bi-State Plan's recommendation for additional research was a general comment about the lack of studies on this subject, rather than a direct response to BLM's failure to consider such additional research in the Bodie Hills grazing decision.  Plaintiffs do not direct the court to any part of the administrative record showing that scientists called for more research to support the Bodie Hills grazing decision.

ii.      Impact of proposed grazing conditions

Plaintiffs also argue that BLM did not fully consider how grazing conditions will affect sage grouse habitat.  (ECF 77-1 at 22.)  Specifically, plaintiffs contend that BLM provided no scientific support for its assertion in the EA that limiting livestock utilization to forty percent will meet the sage grouse's habitat needs.  (ECF 90 at 29.)  BLM responds that there was adequate analysis of the environmental consequences of grazing on sage grouse based on monitoring data, demonstrating that the proposed action would not have significant impact on sage grouse habitat.  (ECF 84-1 at 27; ECF 93 at 16–17.)  Fulstone argues that BLM relied on sufficient scientific studies, contained in the administrative record, and that the absence of a reference to any particular study in the Final EA itself does not render the Final EA inadequate. (ECF 87-1 at 13–14.)

Under NEPA, agencies must disclose both positive and negative anticipated impacts of a proposed action.  *W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1129 (D. Nev. 2008).  NEPA requires agencies to ensure professional and scientific integrity, by setting forth the methodologies used and making "explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1160 (9th Cir. 2006), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) (citing 40 C.F.R. § 1502.24).  Although NEPA regulations only impose this requirement on an EIS, defendant-intervenors do not dispute that it applies to the Final EA here.  *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1019 (9th Cir. 2012) (where defendants did not dispute this requirement applied to the EA, court considered whether it had been met).

The Final EA states that "[s]age-grouse nesting habitat on these allotments would be maintained or improved from both the 40% utilization limit on perennial grass species and the 20% utilization limit on bitterbrush."  (Doc. 49: AR 1326.)  The Final EA acknowledges the risk posed to nests by livestock, but asserts that seasonal restrictions on grazing would limit these impacts.  (*Id.*)  Plaintiffs have not identified any potential negative impacts on sage grouse habitat that were not addressed in the Final EA.

However, the Final EA's analysis of the impacts on sage grouse is defective because it does not comply with the requirement to reference scientific studies.  While there are several references to scientific documents at the end of the section of the Final EA that discuss wildlife, the analysis of impacts on sage grouse does not specify which references it relies on to make conclusions about the impact of the guidelines on sage grouse nesting areas.  *Cf. Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) (Forest Service was not arbitrary and capricious when it referred to scientific literature and data it used to conclude that removing large trees would reduce fire risk); *W. Watersheds Project*, 552 F. Supp. 2d at 1129–30 (most conclusions about the environmental effects of amendment to resource management plan's fire management policy were supported by citations to scientific studies and data, meaning that the EA met minimal requirements under NEPA).

### iii.    West Nile Virus

Finally, plaintiffs argue, the Final EA did not consider the potential impact of an outbreak of West Nile Virus, which caused several sage grouse deaths in 2004.  (ECF 77-1 at 22–23.)  As defendant-intervenors assert, however, plaintiffs show no documentation in the record showing a connection between grazing standards and West Nile Virus.  Accordingly, there was no reason for BLM to consider West Nile Virus in the Final EA.  *See Bicycle Trails Council of Marin v. Babbit,* 82 F.3d 1445, 1446 (9th Cir. 1996); *Cascadia Wildlands Project v. Conroy*, No. CIV. 04-6440-TC, 2006 WL 758541, at *8 (D. Or. Mar. 24, 2006) ("Consideration of effects to the physical environment is required; consideration of remote risks, is not.").

/////

/////

b.      Impact on the Pygmy Rabbit

Plaintiffs argue that the Final EA did not sufficiently consider negative impacts of the grazing decisions on the pygmy rabbit.  (ECF 77-1 at 23; ECF 90 at 30.)  In the section of the Final EA discussing the impact of the grazing decisions on the pygmy rabbit, BLM states that the grazing guidelines would improve plant health, thereby improving pygmy rabbit habitat in the allotments.  (Doc. 49: AR 1327.)  Additionally, the guidelines would increase grass density and cover, and there would be a minimal risk that burrows would be trampled.  (*Id.*)

As evidence that BLM ignored potential adverse effects, plaintiffs point to an excerpt from a 2005 finding by the U.S. Fish and Wildlife Service ("FWS") on a petition to list the pygmy rabbit as threatened or endangered.  (ECF 77-1.)  The FWS finding reviewed numerous scientific articles and acknowledged that grazing can negatively impact pygmy rabbit habitat by damaging plants and trampling burrows or rabbits themselves.  (Doc. 135: AR 3584.)  The FWS concluded that the petitioners it heard from had not shown that grazing posed a threat to the pygmy rabbit because there was no substantial evidence of a significant overlap between pygmy rabbit habitat and grazing areas.  (*Id.*)  Plaintiffs assert that BLM should have considered the threats that petitioners raised in the FWS petition, which are detailed in the 2005 finding.

Although the Final EA's discussion of the anticipated impacts on the pygmy rabbit is extremely short, the court cannot say that BLM ignored any particular potential danger posed to the pygmy rabbit.  Because the anticipated impacts to vegetation in the allotments were low, it was reasonable for BLM to conclude that the pygmy rabbit would be minimally affected.  (*See* Doc. 49: AR 1297.)

However, plaintiffs are correct that BLM did not include any references to scientific studies about the habitat needs of pygmy rabbits.  (*See* Doc. 49: AR 1329-1330.)  BLM argues that a later 2010 FWS finding, which concluded that grazing does not pose a significant risk to the pygmy rabbit, supports BLM's conclusion that the pygmy rabbit will not be adversely affected.  But in the Final EA, BLM did not reference the analysis in that FWS finding or the scientific studies therein.  Moreover, at the time the Final EA was issued, the FWS's 2005 finding had been vacated and the 2010 finding had not yet been completed, meaning that BLM could not

reasonably have relied on either FWS finding.  Because the Final EA does not include references to scientific studies supporting the analysis of anticipated impacts on the pygmy rabbit, this section of the Final EA is defective.

c.      Listing of Sage Grouse or Pygmy Rabbit

Plaintiffs next assert that the Final EA is deficient because it did not consider how the grazing decisions would affect the need to list either sage grouse or the pygmy rabbit as endangered or threatened under the ESA, or acknowledge that both species had been petitioned for listing.  (ECF 77-1 at 23.)  Plaintiffs allege that this omission violates both NEPA and BLM's Special Status Species Policy ("SSSP").  (Id.)  The SSSP provides that in "[i]mplementation-level planning," BLM should consider the following: "all site-specific methods and procedures which are needed to bring the species and their habitats to the condition under which the provisions of the ESA are not necessary"; "current listings under special status species categories are no longer necessary"; and "future listings under special status species categories would not be necessary." (Doc. 174: AR 5229–5230.)  BLM concedes that it was required to comply with the SSSP during the NEPA review process, but argues it complied both with NEPA and SSSP.  (ECF 93 at 16 n.7.)

Plaintiffs provide no legal authority in support of their argument that BLM was required to consider the possibility of listing, and the cases the court has reviewed indicate BLM was not obligated to make this specific determination.  In *Idaho Sporting Congress, Inc. v. Rittenhouse*, the court held that the Forest Service's approval of a timber sale was arbitrary and capricious under NEPA, where the Forest Service predicted that the sale would harm the habitat of several indicator species that lived in the vicinity of the sale.  305 F.3d 957, 974–75 (9th Cir. 2002).  Contrary to the recommendations of the Forest Service's scientists, the EIS did not analyze how the species' habitats would be affected on a larger scale, meaning that the Forest Service did not meet its obligation to consider the cumulative impacts of its actions under 40 C.F.R. § 1508.7.  *Id.*  Similarly, in *Western Watersheds Project v. Salazar*, BLM's omission of an analysis of the cumulative impacts on sage grouse when it renewed grazing permits in five allotments in Idaho and Nevada was arbitrary and capricious.  843 F. Supp. 2d 1105, 1127–28 (D. Idaho 2012).  The court held that because of poor sage grouse habitat conditions in the allotments,

BLM should have considered the cumulative impacts on sage grouse of grazing in the allotments combined with the impacts of grazing in other allotments managed by the same BLM field offices.  *Id.*

In contrast, plaintiffs here do not assert that BLM neglected to consider cumulative impacts on sage grouse of grazing in the Bodie Hills allotments combined with the impacts of grazing on sage grouse in other areas.  Furthermore, plaintiffs do not demonstrate that any adverse impacts of the grazing decision on the population of sage grouse in the Bodie Hills allotments alone would be significant enough to pose a threat to the survival of the species as a whole.  Additionally, unlike the allotments in *Salazar*, BLM determined that the sage grouse habitat in the Bodie Hills allotments is in satisfactory condition.  (*See* Doc. 33: AR 788; Doc. 49: AR 1324) (nest success is high and compares favorably to that reported elsewhere).  In sum, the lack of analysis in the Final EA regarding the likelihood the grazing decisions would contribute to the listing of sage grouse or the pygmy rabbit does not violate NEPA or the SSSP.

3.      Lack of Supplemental Analysis

Even when NEPA review of a particular project is complete, the agency is obligated to conduct additional review when it learns of significant new circumstances or information that affects the proposed action.  *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371–72 (1989).  But supplementation is necessary only if "there remains 'major Federal actio[n]' to occur," as that term is used in 42 U.S.C. § 4332(2)(C).  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 72 (2004).  The NEPA regulation defining "[m]ajor [f]ederal action" includes both "new continuing activities . . . entirely or partly financed, assisted, conducted, regulated or approved by federal agencies . . . ." 40 C.F.R. § 1508.18.

Plaintiffs argue that BLM's decision not to conduct supplemental NEPA analysis, after the FWS issued its finding in March 2010 stating that listing of the sage grouse was "warranted but precluded," was arbitrary and capricious.  (ECF 77-1 at 26.)  Plaintiffs assert that BLM refused even to review the information in the 2010 finding.  (*Id.*)  BLM responds that it had no obligation to consider whether the March 2010 finding warranted supplemental analysis

22

because WWP did not timely request the supplemental analysis, before the permits had already been issued, meaning there was no major federal action still to occur.  (ECF 84-1 at 28.)

The court agrees that BLM was not required to conduct supplemental NEPA analysis based on the 2010 FWS finding because by the time that information became available, the grazing permits had already been issued.  In *Cold Mountain v. Garber*, the Forest Service granted a permit for the operation of a bison capture facility, after considering the impact that the facility might have on endangered bald eagles and issuing a FONSI.  375 F.3d 884, 888 (9th Cir. 2004).  Environmental groups challenged the permits, arguing that the Forest Service should have considered significant new information available after the FONSI was issued, specifically, that the permit's protections for bald eagles were being violated.  *Id.* at 895.  But because the permit had already been issued, the federal action was complete and there was no ongoing major federal action mandating NEPA review.  *Id.*  As in *Cold Mountain*, BLM here had already issued the grazing permits several months before the new information presented by WWP was available. Accordingly, no major federal action remained and BLM's NEPA obligations in this respect were discharged.

Plaintiffs assert that even though the grazing permits had already been issued, BLM is still obligated to comply with NEPA because grazing in the allotments is a "continuing activity." (ECF 90 at 37.)   However, plaintiffs' argument that BLM itself is involved in the grazing activity beyond the initial issuance of permits is unsupported by law.  Plaintiffs contend that because BLM regulations require those who use public lands for grazing to possess a permit for each year of grazing, BLM's actions in renewing permits annually constitute continuous federal action.  (*Id.*)  But BLM's enforcement of the regulations plaintiffs reference is directed to prohibited acts on public lands, 43 C.F.R. § 4140.1, and is not sufficient to constitute major federal action for the purposes of NEPA.  NEPA regulations specifically exclude "bringing judicial or administrative civil or criminal enforcement actions."  40 C.F.R. § 1508.18(a); s*ee also Ctr. for Biological Diversity v. Salazar*, No. CV-09-8207-PCT-DGC, 2010 WL 2493988, at *6 (D. Ariz. June 17, 2010) (BLM's monitoring of compliance with mining plan of operations was not major federal action for the purposes of supplemental analysis under NEPA).

1    4.    Conclusion

2    In sum, the court finds BLM complied with all but one of its NEPA obligations:

3  BLM did not comply with the requirement to reference scientific studies when it considered the

4  impacts of renewing the grazing permits on the sage grouse and pygmy rabbit.

5    B.    Second Cause of Action: Violation of the FLPMA

6    The FLPMA directs BLM to manage public lands "in accordance with" the

7  applicable land use plan.  43 U.S.C. § 1732(a).  This statutory directive prevents BLM from

8  taking actions inconsistent with provisions of a land use plan.  *Norton*, 542 U.S. at 69.  Until the

9  plan is amended, inconsistent actions can be set aside as contrary to law under section 706(2) of

10  the APA.  *Id.*  Plaintiffs' second cause of action asserts BLM's recent grazing decisions

11  concerning the Bodie Hills allotments violate those allotments' land use plan, the Bishop

12  Resource Management Plan ("Bishop RMP").

13    The Bishop RMP contains "resource condition objectives" called "RMP

14  Decisions."  (Doc. 233: AR 8895–8896.)  These RMP Decisions are "area wide," meaning they

15  present management prescriptions valid throughout the entire Bishop Resource Area.  (Doc. 233:

16  AR 8895.)  Among these prescriptions are required yearlong and seasonal protections, including:

17  "Yearlong Protection of endangered, threatened, candidate, and sensitive plant and animal

18  habitats"; "Yearlong Protection within 1/3 mile of sage grouse leks"; and "Seasonal Protection

19  within 2 miles of active sage grouse leks from 5/1 to 6/30."  (Doc. 233: AR 8897.)  Sage grouse

20  leks are "[s]age grouse strutting grounds used during the mating season for courtship displays."

21  (Doc. 233: AR 8983.)  The Bishop RMP also includes an area-wide "Management Theme,"

22  which is to "[r]esolve issues in a manner that will protect and enhance environmental values while

23  allowing for resource use and development."  (Doc. 233: AR 8896.)

24    Plaintiffs contend BLM's grazing decisions violate the Bishop RMP in three ways,

25  all related to the RMP's yearlong and seasonal protection requirements.  The grazing decisions do

26  not provide: 1) seasonal protection within two miles of sage grouse leks and yearlong protection

27  within one-third mile of sage grouse leks; 2) yearlong protection of pygmy rabbit habitat; and

28  3) seasonal and yearlong protections for sensitive species habitat.  (ECF 77-1 at 16–18.)  After

24

discussing the language of the RMP's seasonal and yearlong protections, the court addresses each of these three contentions in turn.

> 1.     The Bishop RMP's Yearlong and Seasonal Protections

The terms "yearlong protection" and "seasonal protection" are central to plaintiffs' second cause of action.  The Bishop RMP's glossary defines these terms. Yearlong protection provides in relevant part: "No discretionary actions which would adversely affect target resources would be allowed.  Existing uses and casual use would be managed to prevent disturbance which would adversely affect the target resources."  (Doc. 233: AR 8987.)  Seasonal protection is defined identically but applies only during a specified period rather than year round.  (Doc. 233: AR 8985–8986.)  For simplicity's sake, the court refers to yearlong and seasonal protections together as "protection requirements."  It is undisputed that cattle grazing, at issue in this case, is an "existing use," (ECF 84-1 at 12; ECF 77-1 at 15), and the Bishop RMP refers to related grazing plans as "Valid Existing Management." (Doc. 233: AR 8890.)  "[T]arget resources" include the pygmy rabbit and the sage grouse.[4]  Thus, to determine whether BLM's grazing decisions violate the Bishop RMP's protection requirements, the court must consider whether cattle grazing was "managed to prevent disturbance which would adversely affect [the pygmy rabbit and sage grouse]."

The parties do not address the meaning of the RMP language "managed to prevent disturbance which would adversely affect [the pygmy rabbit and sage grouse]."  The definitions of the protection requirements distinguish between "discretionary action" on the one hand, defined as "[a]ny action which BLM has authority to either approve or deny," (Doc. 233: AR

---

[4]  The Bishop RMP does not specifically define the "target resources" in the Bodie Hills Allotments, but the area-wide prescriptions that apply to all allotments make clear that the sage grouse and pygmy rabbit, as well as their habitat, are target resources.  (*See* Doc. 233: AR 8897.) In other sections of the Bishop RMP specific to individual management areas, target resources are defined variously as "scenery, riparian habitat and recreation opportunities," (Doc. 233: AR 8909 (Bridgeport Management Area)), "all wilderness values" (Doc. 233: AR 8927 (South Inyo Management Area)), and "endangered fish and sensitive plant habitats" (Doc. 233: AR 8922 (Benton Management Area)).

8982), and "existing uses and casual use" on the other, which are not defined in the RMP but are agreed to include cattle grazing.  "No discretionary actions [are] allowed" if they "would adversely affect target resources."  (Doc. 233: AR 8987.)  This statement communicates an absolute prohibition on discretionary actions that may adversely affect target resources, no matter how slight the adverse effect.  In contrast, existing uses like cattle grazing must be "managed to prevent disturbance which would adversely affect the target resources." To "manage" is to "control the use of money, time, or other resources"; to "prevent" is to "stop something from happening or arising."  COMPACT OXFORD ENGLISH DICTIONARY 618, 806 (3d ed. 2005).  Thus, yearlong protection requires BLM to control the use of cattle grazing to stop adverse effects to the pygmy rabbit and sage grouse from happening.  When compared to the language that suggests absolute prohibition of adverse discretionary actions, the plain meaning of the "existing uses" language is less categorical.  It does not state that any existing uses with adverse effects for target resources are "not allowed," but requires these uses to be "managed" to "prevent" adverse effects. This interpretation is buttressed by the Bishop RMP's management theme, which implicitly recognizes that environmental values should not completely trump resource use.  (Doc. 233: AR 8896 ("Resolve issues in a manner that will protect and enhance environmental values while allowing for resource use and development.").)

The court concludes the plain language of the protection requirements does not mandate that BLM eliminate all adverse effects of cattle grazing on the pygmy rabbit and sage grouse.

2.      Seasonal Protections Within a Certain Distance of Sage Grouse Leks

The Bishop RMP mandates seasonal and yearlong protections.  Seasonal protections, which require cattle grazing to be "managed to prevent disturbance which would adversely affect the target resources," are in effect within two miles of active sage grouse leks from May 1 until June 30.  (Doc. 233: AR 8985.)  As noted above, the Bishop RMP defines "leks" as "[s]age grouse strutting grounds used during the mating season for courtship displays." (Doc. 233: AR 8983.)  Similarly, the Bishop RMP requires "Yearlong Protection within 1/3 mile

of sage grouse leks." (Doc. 233: AR 8897.) This yearlong protection requirement differs from seasonal protection in two primary ways: it applies all year and only within one-third mile of leks.

Plaintiffs contend the grazing decisions violate the Bishop RMP's seasonal and yearlong protections because the grazing cattle adversely affect sage grouse by: 1) causing the abandonment and trampling of nests; and 2) reducing foliage cover, which increases the potential for predation of hens and chicks and disturbs leks. (ECF 77-1 at 16–17.) While the challenged grazing decisions do not permit any grazing on the Bodie Hills allotments during May, grazing on the Bodie Mountain and Potato Peak allotments may begin on June 1 and grazing on the Aurora Canyon allotment may begin June 15. (Doc. 32: AR 769; Doc. 33: AR 796.) Plaintiffs assert these three allotments contain several sage grouse leks and extensive sage grouse nesting habitat, which the permitted grazing imperils. (ECF 77-1 at 16 (citing Doc. 49: AR 1324–1325).)

Defendant-intervenor Flying M counters that the RMP's prescribed protection of leks does not completely prohibit livestock grazing. (ECF 83-1 at 14.) Moreover, the renewed grazing decisions in fact comply with the seasonal and yearlong protection requirements by implementing lower forage utilization limits: a forty-percent utilization limit, down from the previous sixty-percent, on perennial grass species and a twenty-percent utilization limit, down from the previous thirty-percent, on bitterbrush. (*Id.* at 14–15.) Also, BLM specifically considered whether livestock grazing will "adversely affect" sage grouse leks during the mating season, which includes the month of June, and concluded only a slight potential exists. (*Id.* at 15 (citing Doc. 33: AR 788–789).) BLM advances these same arguments, noting that the utilization limits are more severe than the RMP requires, and that the "purpose of these restrictions is to ensure suitable nesting for sage grouse." (ECF 84-1 at 24.)

Defendant-intervenor Fulstone argues that plaintiffs' assertions are unsupported by the record. (ECF 87-1 at 26.) For example, Fulstone says, plaintiffs cite no authority for their contention that "[a]llowing livestock to graze on these allotments from June 1 to June 30 will adversely affect sage-grouse by disturbing nesting mothers and increasing the abandonment of nests." (*Id.*) Plaintiffs cite only the Sage Grouse Bi-State Conservation Plan, and out of context. That plan, developed by all stakeholders including wildlife biologists, states that "[a]uthorized

1    seasons of use on most federal grazing allotments within the Bodie PMU do not begin until after

2    June 1 . . . [] eliminat[ing] the potential for lek disturbance in the majority of the PMU." (*Id.*

3    (citing Doc. 143: AR 4469).)

4              As discussed below, the court finds BLM's grazing decisions do not violate the

5    Bishop RMP's seasonal and yearlong protection requirements.  The court first addresses

6    plaintiffs' nest abandonment and trampling argument, and then considers plaintiffs' foliage

7    utilization argument, that the grazing decisions reduce foliage cover causing predation of hens and

8    chicks and disturbance of leks.

9                             a.      Nest abandonment and trampling

10             In support of their contention that the grazing decisions violate the seasonal and

11   yearlong protections by increasing the abandonment and trampling of nests, plaintiffs cite to a

12   paragraph of the Bi-State Plan, which is often the crux of the debate between the parties on the

13   seasonal and yearlong protections issues.  That paragraph reads in relevant part:

14

15               Lek disturbance and nest trampling by domestic livestock during
                 the breeding season are potential population risks. Authorized
16               seasons of use on most federal grazing allotments within the Bodie
                 PMU do not begin until after June 1 (Table 5.4.5-1). This
17               eliminates the potential for lek disturbance in the majority of the
                 PMU. Some potential for lek disturbance exists from early season
18               grazing in or adjacent to Bridgeport Valley; however, with the
                 exception of lek 10 at Lower Summers Meadow, no leks are
19               currently documented for this portion of the PMU. Most authorized
                 seasons of use also occur after the peak of the nesting season and
20               this significantly reduces the potential for nest disturbance or
                 trampling. However, June hatching dates have been documented in
21               the Bodie PMU and some potential for nest disturbance and
                 trampling does exist for late season nesters. Sage-grouse are
22               indeterminate nesters known to abandon nests when disturbed
                 (Cite) [*sic*]; but the potential for nest disturbance or trampling is
23               also limited by permitted seasons of use, as well as livestock
                 behavior. Except when trailing, cattle do not travel in large groups
24               or walk directly through sagebrush habitats in a manner that would
                 likely crush or disturb a nest site.

25   (Doc. 143: AR 4469.)  Because June hatching dates in the Bodie allotments have been

26   documented and the grazing permits allow grazing in June, plaintiff's contention that cattle can

27   potentially disturb nests, causing abandonment, and can potentially trample nests, is credible.

28   Defendant-intervenors argue that BLM specifically considered whether livestock grazing will

"adversely affect" sage grouse during nesting season and concluded there is only "slight potential for either direct nest destruction or abandonment of nests due to livestock presence on the allotment during sage-grouse nesting season." (*See, e.g.*, ECF 83-1 at 15 (citing Doc. 33: AR 788–789).)

BLM's conclusion, that only slight potential for nest destruction or abandonment exists, is supported by the record. Citing the EA, BLM first reasoned in the grazing decisions that allowing grazing in June is consistent with the seasonal protection requirement because "the actual period of potential overlap between livestock use and nesting sage-grouse on the allotments would occur after the peak of the nesting season in the Bodie Hills." (*Id.* (citing Doc. 33: AR 788).) This assertion is supported by the Bi-State Plan's language upon which plaintiffs rely. (Doc. 143: AR 4469 (the potential for overlap between livestock and nesting sage grouse on the Bodie allotments is limited because grazing is authorized only after the peak nesting season).) Therefore, by permitting grazing on the allotments beginning on June 1 or June 15, which is after the peak nesting season, BLM is managing grazing to prevent adverse effects to sage grouse.

Plaintiffs also take issue with BLM's statement in the EA and in the grazing decisions that telemetry studies have not documented any actual nest destruction or disturbance. (ECF 90 at 13 (citing Doc. 136: AR 3608).) Plaintiffs assert telemetry studies are not designed to document such impacts. (*Id.*) Neither party defines telemetry for the court or cites evidence about what telemetry studies are capable of documenting. Plaintiffs cite to a 2008 study conducted "during the last 3 weeks of incubation" in Nevada in which 10 percent of sage grouse hens videotaped were flushed from their nests by cows. (*Id.* (citing Doc. 30: AR 650–651).) However, plaintiffs do not provide any contextual information about this study, such as whether it was conducted after the peak nesting season or whether the hens returned to their nests after being flushed. However, the study does suggest that cows can harm nests and cause nest abandonment. This suggestion is reinforced by the FWS Report, which cites several studies to conclude that grazing cattle do destroy nests and cause nest abandonment. (Doc. 136: AR 3608.) BLM concedes this fact. BLM has simply concluded, consonant with the evidence in the record, that

the possibility of nest harm or abandonment is minimized by permitting grazing only after peak nesting season.

BLM's second rationale supporting its conclusion that only a slight potential for nest destruction or abandonment exists is less persuasive.  BLM reasons that overall nest success in the Bodie Hills is high and compares favorably to that reported elsewhere in sage grouse range.  (*See* Doc. 33: AR 788; Doc. 49: AR 1324.)  This assertion about the relative success of nesting on the allotments at issue is too ambiguous to be given weight.  BLM does not provide contextual information, such as whether and when cattle graze in the other parts of the sage grouse range, to clarify the strength of this comparison.

BLM's third rationale is that nesting habitat quality or quantity and nest success are not limiting factors for sage grouse on the allotments.  (Doc. 33: AR 787; Doc. 49: AR 1324.)  The 2005 FWS Report does not contradict this statement.  The Report concluded that grazing is a potential extinction risk factor, even though there are no studies of livestock effects on a rangewide scale.  (Doc. 136: AR 3608.)  But this conclusion "incorporates not only the direct effects of grazing, but all associated activities, such as vegetation management, fencing, overuse of riparian habitats by domestic livestock, etc."  (*Id.*)  Plaintiffs do not allege BLM is not complying with the Bishop RMP's other mandates, such as limitations on grazing in riparian areas, that address these other effects of grazing.  Furthermore, the panel also concluded that "proper grazing management may be a beneficial tool for enhancing greater sage-grouse habitats . . . ."  (*Id.*)  Plaintiffs do not contest the veracity of BLM's third rationale, and it supports BLM's contention that it is providing seasonal protection for sage grouse.  (Doc. 143: AR 4468 (Bi-State Plan noting: "Though the sample size is extremely small (n=10), currently available data suggests that nest success is not an issue in the Bodie PMU at this time.").)

BLM might not be managing grazing to prevent adverse effects if it permitted an activity that can exacerbate a limiting factor for sage grouse.

Plaintiffs' seasonal protection argument also is meritless because it focuses on sage grouse nests rather than leks.  The Bishop RMP's seasonal protection is required only within two miles of active sage grouse leks.  (Doc. 233: AR 8897 ("Seasonal Protection within 2

miles of active sage grouse leks from 5/1 to 6/30.").)  "Leks" are not coterminous with nesting areas, but are the strutting grounds used during mating for courtship displays.  (Doc. 233: AR 8983.)  Therefore, the question whether the contested grazing permits violate the Bishop RMP's seasonal protection requirement depends on whether those potential adverse effects occur within two miles of active strutting grounds.  In the contested grazing decisions, BLM addressed plaintiffs' merging the concepts of "nests" and "leks," albeit in a different context.[5]  BLM noted that the Bishop RMP's requirement to restrict salt and nutrient supplements to an area more than one-quarter mile from leks "is not designed to reduce or mitigate potential impacts to nesting habitat as assumed and misinterpreted in the protest, but rather to protect the actual lek sites from any concentrated use that could modify the physical setting or vegetation conditions of these traditional display areas."  (Doc. 33: AR 787.)  Furthermore, the record reveals that nesting sites typically are located a large distance from leks.  (Doc. 142: AR 3885 (a large majority of nesting sites are located between 2.5 and 8.6 kilometers from lek-of-capture).)  Therefore, plaintiffs' argument that BLM is not complying with the seasonal and yearlong protection requirements within two miles and one-quarter mile of leks because of possible harm to nests, rather than leks, is fundamentally flawed.  Importantly, plaintiffs do not argue, and no evidence in the record suggests, that grazing on these allotments interferes with sage grouse mating, which would be associated with leks.

Furthermore, as the court concluded above, BLM has provided the necessary seasonal protections for sage grouse by permitting grazing only after the peak nesting and mating season.  Plaintiffs' argument on this point has no merit.

b.       Reducing foliage cover (utilization)

Plaintiffs also contend the BLM's grazing decisions violate the Bishop RMP's seasonal and yearlong protection requirements because cattle will graze on foliage, which, according to the Bi-State Plan, reduces cover and increases the potential for predation of hens and

---

[5] As noted in the discussion above of defendant-intervenors' exhaustion arguments, plaintiffs did not raise these precise seasonal and yearlong protection arguments administratively, so BLM could not have addressed them specifically.

31

chicks.  (ECF 77-1 at 16 (citing Doc. 143: AR 4462).)  Plaintiffs cite the 2005 FWS Report, which cites three studies to conclude that "[i]t has been demonstrated that the reduction of grass heights due to livestock grazing of sage-grouse nesting and brood-rearing areas negatively affects nesting success by reducing cover necessary for predator avoidance."  (ECF 90 at 12 (citing Doc. 136: AR 3607).)  Plaintiffs argue that reduced cover also affects the ability of sage grouse to escape and hide during breeding season.  (*Id.* at 17.)  While plaintiffs' citation to the record does not support this assertion (ECF 77-1 at 17 (citing Doc. 142: AR 4072–4075)), the Bi-State Plan does.  (Doc. 143: AR 4468 ("While there is little direct scientific evidence that links livestock grazing to sage-grouse population levels, indirect evidence suggests that grazing practices that significantly reduce the height and cover of the herbaceous understory in breeding habitat may negatively affect sage-grouse populations.").)  Plaintiffs also assert no deference should be given BLM's determination that the foliage grazing utilization requirements fulfill BLM's protections obligation because BLM did not explain its reasoning.  (*Id.* at 15 (citing *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001)).)

Defendant-intervenor Fulstone argues that the terms and conditions governing the grazing permits incorporate the Bishop RMP's seasonal and yearlong protection utilization requirements, as amended in 2000 by the Standards for Rangeland Health and Guidelines for Livestock Grazing Management ("Rangeland Health Standards").  (ECF 87-1 at 24–26 (citing Doc. 193: AR 5945–5948).)  Fulstone also maintains plaintiffs' references to the Bi-State Plan are taken out of context.  (*Id.* at 27.)  Fulstone notes the Plan mentions several studies reporting that properly managed and timed grazing can improve sage grouse habitat by increasing forb availability.  (*Id.* (citing Doc. 143: AR 4468).)

Defendant BLM and defendant-intervenor Flying M also assert the grazing decisions here explicitly comport with the requirements of the Bishop RMP and the Rangeland Health Standards.  (ECF 83-1 at 14–15; ECF 93 at 10–12.)  The permits include mandatory terms and conditions such as livestock number, livestock kind, season of use, and allocated "animal unit

months" ("AUMs"),[6] all of which are prescribed by the Bishop RMP.  (ECF 93 at 11.)  Moreover, BLM points to EA language indicating the permits include a "20% reduction in use for key perennial species from the requirements of the Bishop RMP, and a 10% reduction for bitterbrush."  (*Id.* (citing Doc. 49: AR 1296–1297, 1326).)  BLM claims it considered forage utilization concerns in the EA and in the permitting process and explained its reasoning in finding that "sage-grouse nesting habitat on these allotments would be maintained or improved" by these more stringent utilization standards.  (*Id.* at 12 (citing Doc. 49: AR 1326).)  These stringent standards were adopted to benefit the sage grouse, not the permittees, BLM explains, as evidenced by the permittees' appeal of these standards as too restrictive.  (*Id.* (citing Doc. 170, 171: AR 5169–5186).)

          Plaintiffs counter that the lower utilization standards will result in distributing livestock across a broader area, which necessarily spreads the impacts associated with livestock grazing.  (ECF 90 at 14 (citing Doc. 142: AR 4072–4073).)  They say sage grouse require a canopy cover composed of more than fifteen percent grasses and forbs, and residual grass height of seven inches.  (*Id.* (citing Connelly Guidelines, Doc. 190: AR 5921).)  Maintaining a residual grass height of seven inches requires a thirty-percent utilization standard at most, plaintiffs contend.  (*Id.* (citing *W. Watersheds Project v. Dyer*, No. 08-CV-516-BLW, 2009 WL 484438, at *21 (D. Idaho Feb. 26, 2009)).)

          The court finds the grazing permits' utilization limits of forty-percent on perennial grass species and twenty-percent on bitterbrush are consistent with BLM's mandate to manage grazing to prevent disturbance that would adversely affect the sage grouse and their leks.  BLM adequately explained its reasoning for its conclusion that the lower utilization levels would not adversely affect the sage grouse.  Citing two specific studies, BLM reasoned in the EA that the forty-percent utilization of native vegetation "has been shown to benefit plant production and resilience" and is designed to help reduce the spread of weeds.  (Doc. 49: AR 1296–1297.)  BLM Rangeland Health Assessments in 2001 and 2003 concluded the cattle stocking rates were

---

[6] "AUM" is defined in the Bishop RMP as "[t]he amount of forage necessary for the sustenance of one cow or five sheep for one month."  (Doc. 233: AR 8981.)

33

1    moderate and did not impair the large-scale ecological function of specifically-enumerated plant

2    communities, including perennial grasses.  (Doc. 49: AR 1297.)

3               Further, BLM found grazing impacts such as localized soil disturbance

4    would affect only very small portions of these allotments, less than two acres total on each

5    allotment, where mineral blocks and watering activities occur.  (*Id.*)  Even if the court accepted

6    the seven-inch height requirement for perennial grasses contained in the Connelly Guidelines

7    (Doc. 190: AR 5921), there is no evidence in the record indicating what alternative utilization

8    level would maintain this height.  Plaintiffs cite a District of Idaho case to support their claim that

9    a seven-inch height requirement demands a maximum thirty-percent utilization standard.  *Dyer*,

10   2009 WL 484438, at *21 ("[M]onitoring is necessary to ensure that use of herbaceous forage is

11   limited to about 30% of annual production.").  Even if this court were to assume the term

12   "herbaceous forage" includes perennial grass, the *Dyer* case is not persuasive, given that it was

13   decided on a different administrative record and concerned land in a different state utilizing a

14   different RMP.  BLM's considered position that rangeland health will be sustained by the forty-

15   and twenty-percent utilization standards, a position based on studies to which plaintiffs do not

16   object, deserves deference from this court.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377

17   (1989) (in an APA dispute primarily involving issues of fact, the court "must defer to 'the

18   informed discretion of the responsible federal agencies.'").

19               In the yearlong protection context, plaintiffs additionally contend that the

20   grazing decisions' monitoring requirements explicitly apply only to "key areas," a term that is

21   undefined, and the decisions do not indicate how many of the allotments' leks are located in these

22   "key areas."  (ECF 77-1 at 17.)  Even in the key areas, monitoring is ineffectual because,

23   plaintiffs argue, BLM will respond to noncompliance only if livestock consume more than

24   seventy-percent of the vegetation for two years in a row.  (*Id.*)

25               Assuming, without deciding that yearlong protection mandates monitoring,

26   plaintiffs' monitoring arguments also are unavailing.  On May 1, 2008, BLM entered into "Joint

27   Cooperative Monitoring Plans" with intervenors concerning the allotments at issue here.  (Doc.

28   61: AR 1504–1511; Doc. 62: AR 1512–1519.)  These Plans prescribe various short-term and

34

long-term monitoring protocols to ensure the resource objectives on the allotments are being met. (*See, e.g.*, Doc. 61: AR 1507–1508.)  The Plans indicate the monitoring sites will be determined "according to BLM protocol" and that short-term sites "shall be located in key areas determined cooperatively to have resource concerns or to be representative of livestock utilization in an allotment, use area, or portion of a use area."  (Doc. 61: AR 1508.)  Sage grouse habitat is specifically enumerated as a resource concern.  (Doc. 61: AR 1510–1511.)

During the permitting process, BLM explicitly considered plaintiffs' argument that the monitoring regime's seventy-percent utilization threshold to trigger a BLM response is inadequate.  (Doc. 32: AR 757–758.)  BLM explained:

> The 40 percent average utilization guideline established by the [Central California Standards] pertains to an entire allotment and therefore utilization numbers for a particular upland key area may be greater than, equal to, or less than 40 percent. However, as stated in the proposed term and condition, 'Because of the potential long-term damage to perennial grass species associated with severe grazing, when grazing utilization exceeds 70% in any upland key area for more than 2 consecutive years, immediate management action will be taken to remedy the problem in the area of the allotment that key area represents.' The 70% utilization guideline refers to a single key area where data is collected.

(Doc. 32: AR 758.)  As this explanation clarifies, the seventy-percent trigger exists to ensure the intervenors do not graze a particular area to excess while leaving other areas untouched.  Without this trigger, the intervenors could comply with the forty-percent average limit on the allotment as a whole while overgrazing a particular area.  Here again, on this record, the court accords BLM deference with respect to its reasoned conclusion that this monitoring regime is sufficient to comply with the allotments' resource objectives.  *Marsh*, 490 U.S. at 377.

c.    Case law

Plaintiffs' cited cases do not direct a different result.  For example, this case is distinguishable from *Western Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217 (D. Idaho 2005).  There, the governing RMP mandated that any increase in grazing "would not be authorized unless monitoring studies indicate that the basic soil, vegetation, and wildlife resources are being protected and additional forage is available."  *Id.* at 1227–28.  The court found BLM did not conduct any monitoring at all before approving increased grazing.  *Id.*  Here, there are no

similar bright-line facts.  Rather, there are potential adverse effects to sage grouse and their leks that may lie within the protected area.  Moreover, the threshold mandate in *Bennett* to monitor also was more clear.  Here, by contrast, BLM must manage grazing "to prevent disturbance which would adversely affect" sage grouse and their leks.  The Bishop RMP's mandate involves greater discretion than the mandate in *Bennett*, and therefore *Bennett* cannot guide the court on the quantum of potential adverse effects sufficient to constitute a FLPMA violation.  *See Norton*, 542 U.S. at 72 ("[W]e find it unnecessary to consider whether the action envisioned by the statements [in the land use plan] is sufficiently discrete to be amenable to compulsion under the APA.").

Neither does *Oregon Natural Resources Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007) control this case.  *Brong* involved a salvage logging project to remove large standing dead or dying trees, known as "snags," in a thousand acres of protected land in Oregon after a forest fire.  *Id.* at 1123, 1128.  The governing management plan's relevant mandate was that "management should focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags."  *Id.* at 1128.  The court found the project contravened this mandate for several reasons.  First, the court found BLM's interpretation of the mandate deserved no deference because its interpretation of the plan's management directive was inconsistent with the plan, which was no "ordinary government land-management strategy."  *Id.* at 1126–27.  The plan's contentious history was evidence of its singularity: it was a response to a long and bitter legal battle over the scope of logging in old-growth forests inhabited by the endangered spotted owl.  *Id.*  BLM had construed the plan's management directive as "balancing environmental concerns and economic factors equally," but the court found the management directives prioritized environmental concerns.  *Id.*  In the instant case, plaintiffs do not argue BLM has misinterpreted the management directive of the Bishop RMP, which is to "[r]esolve issues in a manner that will protect and enhance environmental values while allowing for resource use and development."  (Doc. 233: AR 8896.)  BLM nowhere asserts as a defense to its grazing decisions that economic and environmental values are on par in the Bodie Hills Management Area.  Rather, BLM has acknowledged its responsibility to comply with the seasonal protection requirement and contends it has considered whether permitting

grazing in June would adversely affect the sage grouse; it has concluded that little potential for adverse effects exists.

Second, the *Brong* court found BLM's "some-is-enough" argument in that case, whereby it asserted leaving eight-to-twelve snags per acre on average was sufficient to protect wildlife habitat, was "grossly misleading"; in reality over two-thirds of the affected acreage would be completely stripped of all snags. 492 F.3d at 1129–30. Here, no such clear evidence of grazing causing adverse effects to the sage grouse is before the court.

3.     Yearlong Protection of Pygmy Rabbit Habitat

Plaintiffs also contend that the Bodie Hills grazing decisions violate the Bishop RMP because they do not provide yearlong protection of pygmy rabbit habitat. (ECF 77-1 at 17.) The decisions do not contain any provisions to limit disturbance of the pygmy rabbit habitat or to monitor habitat for any adverse effects from grazing, which could include trampling of burrows, depletion of grasses used for food, and damage to sagebrush that provides food and cover from predators. (*Id.* at 8, 17.) In their reply, plaintiffs recycle their seasonal protection utilization and nest disturbance and trampling arguments concerning the sage grouse and simply substitute reference to the pygmy rabbit. (*See* ECF 90 at 11, 14–15.)

Responding in kind, defendant-intervenors largely address plaintiffs' pygmy rabbit arguments together with their sage grouse arguments. (*See, e.g.*, ECF 83-1 at 14.) Intervenor Flying M additionally argues that the reduced utilization limits will result in increased grass density and cover, which will benefit the pygmy rabbit. (*Id.* at 16–17 (citing the EA, Doc. 49: AR 1327).) Defendant-intervenor Fulstone contends BLM considered in the EA and its FONSI whether the grazing decisions would adversely affect the pygmy rabbit and concluded they would not. (ECF 95 at 8 (citing Doc. 48: AR 1232–1237; Doc. 49: AR 1323–1330).) BLM argues the scientific data shows the pygmy rabbit is not threatened by livestock grazing. (ECF 93 at 13 (citing Doc. 3: AR 28).)

The Bishop RMP does not specifically mention the pygmy rabbit. However, its area-wide prescriptions include "Yearlong Protection of endangered, candidate, and sensitive plant and animal habitats." (Doc. 233: AR 8897.) BLM recognizes the pygmy rabbit as a

37

1  sensitive species.  (Doc. 49: AR 1317.)  Therefore, yearlong protection requires cattle grazing be

2  "managed to prevent disturbance which would adversely affect" the pygmy rabbit.  (Doc. 233:

3  AR 8987.)  Unlike the seasonal and yearlong protection requirements the court has already

4  considered, this yearlong protection is not tethered to any spatial requirement.

5          The court finds the BLM did not violate the Bishop RMP's yearlong protection

6  requirement for the pygmy rabbit in issuing its grazing decisions.  BLM considered the impacts of

7  cattle grazing on pygmy rabbit habitat in the EA and concluded the likelihood of adverse effects

8  was minimal.  (Doc. 49: AR 1325–1329.)  First, BLM found that the reduced utilization standard

9  would improve plant community vigor (Doc. 49: AR 1296–1297 (citing two studies)), thereby

10  improving pygmy rabbit habitat (Doc. 49: AR 1327).  Second, BLM concluded the potential for

11  burrow collapse would be minimal "based on existing information."  (*Id.*)  BLM further explained

12  in the grazing decisions that "[t]o date, field office biologists have not documented any evidence

13  of such burrow collapse despite extensive field experience working in both currently occupied

14  and potential pygmy rabbit habitats found on the allotments."  (Doc. 33: AR 789.)  BLM's

15  conclusion that burrow collapse is "rare" is therefore based on "direct field observations,

16  combined with professional and applied knowledge of both pygmy rabbit habitat requirements

17  and allotment specific habitat conditions."  (*Id.*)

18          Furthermore, evidence in the record supports BLM's conclusion.  The 2010 FWS

19  Report determined that livestock grazing is not a significant threat to the pygmy rabbit.  (Doc. 3:

20  AR 28.)  Grazing at inappropriate levels can degrade the sagebrush habitat, but at reasonable

21  levels it may be beneficial.  (Doc. 3: AR 27.)  The Report acknowledged that burrow trampling

22  can occur, but stated its authors are "not aware of any studies relating actual site abandonment,

23  increased predation, death, or injury due to livestock grazing or trampling."  (Doc. 3: AR 28.)

24  The Report also concluded "there is no indication of a causal relationship between livestock

25  grazing and pygmy rabbit site abandonment or avoidance."  (*Id.*)

26          Finally, BLM's monitoring regime, described above, is designed to ensure

27  intervenors comply with the utilization requirement.  (*See* Doc. 32: AR 758.)  While the absence

28  of any explicit reference to the pygmy rabbit in the EA, the Central California Standards, or the

38

Joint Cooperative Monitoring Plan suggests BLM does not conduct regular monitoring of pygmy rabbit populations specifically, the court declines to read this requirement into the Bishop RMP, which also does not specifically mention the pygmy rabbit.

4.   Yearlong Protections for Sensitive Species Habitat

Plaintiffs finally contend that BLM does not "make any attempt to provide the seasonal and yearlong protections for sensitive species habitat required by the Bishop RMP." (ECF 77-1 at 17–18.)  As noted above, the Bishop RMP contains a general requirement mandating "Yearlong Protection of endangered, candidate, and sensitive plant and animal habitats." (Doc. 233: AR 8897.)  Thus, the Bishop RMP requires only yearlong, not seasonal, protections for sensitive species habitat.  The sage grouse and pygmy rabbit are the only sensitive species on these allotments.  (Doc. 49: AR 1322–1323.)  Plaintiffs' final argument thus reiterates the claim that BLM must provide yearlong protection for the sage grouse and pygmy rabbit and their habitats.  The court has already addressed and rejected these claims.  While the general yearlong requirement does not contain a spatial element for sage grouse, as the seasonal and yearlong protections addressed above do, this difference is not material. The court's finding -- that plaintiffs' seasonal and yearlong arguments, in the context of the two-mile and one-third-mile proximity to leks, lacks merit -- is independent of those spatial requirements.

C.   Third Cause of Action: Violations of the FLPMA and the SSSP

In their complaint, plaintiffs enumerate a third cause of action, which alleges a violation of the FLPMA and the SSSP.  The gravamen of this claim is that the SSSP requires BLM to "ensure that actions authorized, funded or carried out by BLM do not contribute to the need for the species to become listed." (Compl. ¶ 91.)  However, plaintiffs did not move for summary judgment on this cause of action: the only mention of the SSSP in plaintiffs' moving papers is in the context of their NEPA claim.  (ECF 90 at 26–27.)  Intervenor Fulstone argued in its motion for summary judgment that plaintiffs have abandoned their third cause of action, and plaintiffs did not address this argument in their reply.  (ECF 87-1 at 29.)  Plaintiffs' reply also mentions the SSSP only in the context of NEPA.  (ECF 90 at 26–27.)  Accordingly, the court considers this claim abandoned and declines to address it.  *Morales v. City of Delano*, 852 F.

Supp. 2d 1253, 1271 (E.D. Cal. 2012) ("Where a defendant moves for summary judgment and the plaintiff does not oppose or raise the claim in opposition, the claim is deemed abandoned.") (citing *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)).

V.    CONCLUSION

1. Plaintiffs' motion for summary judgment as to their FLPMA claims is denied. Defendant-intervenors' motion for summary judgment as to plaintiffs' FLPMA claims is granted.

2. Plaintiffs' and defendant-intervenors' motions for summary judgment as to the NEPA claims are granted in part and denied in part, as set forth in this order.

3. The parties are ordered to brief the question of the appropriate remedy for the BLM's violation of NEPA in preparation for a hearing set for October 25, 2013 at 10:00 a.m.  The parties shall limit the length of their briefs to five pages each.  Plaintiffs shall file their brief by September 27, 2013; defendant-intervenors shall file a single joint brief in response by October 11, 2013; and plaintiffs may reply by October 18, 2013.

IT IS SO ORDERED.

DATED:  September 3, 2013.

_____
UNITED STATES DISTRICT JUDGE